UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ARDESHIR AMIRENTEZAM,<br><br>ANOUSHIRAVAN AMIRENTEZAM, and<br><br>ELHAM ENTEZAM BREUER<br><br>                Plaintiffs,<br><br>       v.<br><br>ISLAMIC REPUBLIC OF IRAN, and<br>THE ISLAMIC REVOLUTIONARY GUARD CORPS<br><br>   c/o Ministry of Foreign Affairs<br>   Khomeini Avenue<br>   United Nations Street<br>   Tehran, Iran,<br><br>                Defendants. | Case No.: 1:19-cv-2066 |

## COMPLAINT

Plaintiffs ARDESHIR AMIRENTEZAM, ANOUSHIRAVAN AMIRENTEZAM, and ELHAM ENTEZAM BREUER (collectively, the "Amirentezam family" or "Plaintiffs"), by and through undersigned counsel, bring suit against Defendants the Islamic Republic of Iran and the Islamic Revolutionary Guard Corps ("IRGC") (collectively, "Iran" or "Iranian Government" or "Defendants") under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq*. ("FSIA"), for severe personal injuries and other irreparable harm suffered as a result of Defendants' unlawful acts of terrorism, torture, hostage taking, and other torts against Abass Amir-Entezam and themselves, and in support thereof state the following:

### PARTIES

1. Plaintiff ARDESHIR AMIRENTEZAM ("Ardeshir"), son of Mr. Abass AmirEntezam, citizen of United Stated, resident of the state of California.

2. Plaintiff ANOUSHIRAVAN AMIRENTEZAM ("Anoush"), son of Mr. Abass Amir-Entezam, citizen of United Stated, resident of the state of California.

3. Plaintiff ELHAM ENTEZAM BREUER ("Elham"), daughter of Mr. Abass Amir-Entezam, citizen of United Stated, resident of the state of Washington.

4. Defendant the Islamic Republic of Iran is a foreign state. Iran is a theocratic republic with an elected head of government and a head of state—the Supreme Leader—appointed for life by a council of theologians. The Supreme Leader controls the Guardian Council of the Constitution,

which interprets the Iranian Constitution, supervises elections (including by determining which candidates may run), and exercises significant influence over the legislative, executive, and judicial branches of government, as well as the military and IRGC.

5. Defendant the Iranian Revolutionary Guard Corps or IRGC is a military organization under the control of the Supreme Leader. The IRGC was established in the wake of the Islamic Revolution to act as the country's "ideological custodian" and is generally understood to be one of the most reactionary, powerful, and oppressive factions of the Iranian Government. The IRGC fields an army, navy, air force, and intelligence service, and it conducts foreign operations through its paramilitary arm, the Quds Force. The IRGC has been designated by the U.S. Department of Treasury as a sponsor and supporter of terrorism. In addition, IRGC's security apparatus has direct control over Iran's Judiciary branch; Judiciary will arrest, interrogate, torture, detain, and conduct fake trials with IRGC's order.

## JURISDICTION

6. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1330 and 1331, and pursuant to the FSIA, 28 U.S.C. § 1605A.

7. This action falls within the "terrorism exception" to sovereign immunity under the FSIA, 28 U.S.C. § 1605A(a)(1), which provides, in relevant part, that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States … in any case … in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture … [or] hostage taking … if such act … is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."

8. This suit seeks money damages against Iran and its agencies and instrumentalities for injury and harm caused to the Plaintiffs by acts of terrorism, torture, and hostage taking against Plaintiffs.

9. These acts of terrorism, torture, and hostage taking were perpetrated by officials, members, and agents of the IRGC and other agents and instrumentalities of Iran while acting within the scope of their official capacities.

10. Plaintiffs are U.S. citizens and nationals of the United States within the meaning of the FSIA and were such at the time of the acts of torture and hostage taking alleged herein. See 28 U.S.C. § 1605A(a)(2)(A)(ii) ("The court shall hear a claim under [the FSIA] if … the claimant or the victim was, at the time the act … occurred a national of the United States.").

11.    Defendant Iran has since January 19, 1984, been designated a "state sponsor of terrorism" by the Secretary of State for purposes of section 6(j) of the Export Administration Act of 1979, section 620A of the Foreign Assistance Act of 1961, and section 40 of the Arms Export Control Act, and thus Defendants are a "state sponsor of terrorism" within the meaning of the FSIA.[1] See 28 U.S.C. § 1605A(a)(2)(A)(i)(I) ("The court shall hear a claim under [the FSIA] if … the foreign state was designated as a state sponsor of terrorism at the time the act … occurred[.]").

12.    Venue for a civil action against a foreign state lies in this Court pursuant to 28 U.S.C. § 1391(f)(4) (venue is proper in the United States District Court for the District of Columbia "if the action is brought against a foreign state or political subdivision thereof").

## STATEMENT OF FACTS

13.    Mr. Abbas Amir-Entezam was Iran's longest serving prisoner of conscience and received of international human rights awards. He was arrested in December of 1979, few days after U.S. Embassy in Tehran was took over by a group of Iranian college students belonging to the Muslim Student Followers of the Imam's Line, who supported the Iranian Revolution. He kept in solitary confinement for 555 without charges. After 42 hostages were released, he faced a facade trial and was sentenced to life imprisonment in March of 1981. During his first seventeen years in jail, he had no visitation rights, and never spoke to his children or a lawyer. After 1998 he was between house arrest and jail until he died in 2018 while under house arrest in Iran, after serving over 38 years of a life sentence. At the time of arrests Plaintiffs were 2, 6, and 9 years old.

14.    In an article discussing Mr. Amir-Entezam's plight, the Independent Newspaper wrote: "No doubt Iran, the birthplace of one of the world's greatest civilizations, will someday shed the yoke of theocracy and fulfill the many hopes of its youths for a better future. In that Iran, the story of Abbas Amir-Entezam, his patriotism, his heroism, his service and his refusal to surrender to oppression, will be taught to school children as an icon of citizenship and sacrifice. Until then, his plight lives on in all those who fight for rule of law everywhere around the world."[2]

---

1. *State Sponsors of Terrorism*, U.S. Dep't of State, http://www.state.gov/j/ct/list/c14151.htm (last visited Oct. 3, 2016).

2. Roya Hakakian, *Abbas Amir-Entezam: Iranian politician who went from deputy prime minister to long-suffering political prisoner*, INDEPENDENT (Jul. 17, 2018), https://www.independent.co.uk/news/obituaries/abbas-amir-entezam-dead-cause-age-iran-jail-political-prisoner-spy-deputy-prime-minister-a8451066.html.

15. Mr. Abbas Amir-Entezam was born in Iran in 1932. Mr. Amir-Entezam held a Master's degree in Science and Engineering from the University of California at Berkeley in the United States. Upon completion of his university studies, Mr. Amir-Entezam started a construction company in Iran with a few well-known figures from the National Resistance Movement of Iran.

16. In February of 1979, the Iranian monarchy fell, and Ayatollah Ruhollah Khomeini, the leader of the revolution, appointed Mehdi Bazargan to form an interim government. Mr. Bazargan first appointed Mr. Abbas Amir-Entezam as a deputy prime minister and later chose Mr. Amir-Entezam as Iran's ambassador to the Scandinavian countries.

17. After the takeover of the U.S. Embassy in Tehran by a group of Iranian college students, the interim Iranian government was put in an extraordinarily difficult predicament. The interim government formally announced its opposition to the students' actions. However, many different groups vehemently supported the takeover of the embassy, which caused an escalation of the disagreements between clergies with Khomeini's leadership and Bazargan's colleagues. Ultimately, these disagreements over the embassy takeover resulted in the resignation of the interim government.

18. In December of 1980, Mr. Amir-Entezam received a message from the Foreign Ministry asking him to return to Tehran for consultation on issues related to Europe and the United States. The letter was signed by Sadegh Ghotbzadeh, the new Minister of Foreign Affairs. Hans Blix, Sweden's Minister of Foreign Affairs, hours before Mr. Amir-Entezam's flight to Tehran, personally called Amir-Entezam's residence and told him: "I advise you not to return to Iran. Our intelligence agency has found out that this is a trap for you." Mr. Amir-Entezam conveyed his gratitude for the warning but told Mr. Blix that the issue was an internal affair and that he expected Mr. Blix not to interfere with his travel to Tehran.

19. On December 19, 1979, less than 24 hours after Mr. Amir-Entezam's return to Tehran, the Revolutionary guards arrested him on the orders of Ali Ghadousi, the Head Revolutionary Prosecutor, without announcing any formal charges. Two days after Mr. Amir-Entezam's arrest, the students who were occupying the U.S. embassy in Tehran brought claims against him based on documents found at the embassy. It was through them that the news of his arrest was published. For more than 15 months, Mr. Amir-Entezam awaited trial without access to visitors, a lawyer, or the details of the case against him. After those 15 months, the prosecutor's office and judicial officials remained completely silent about the official charges against him.

20. Mr. Abbas Amir-Entezam was in solitary confinement for approximately 550 days, until the 18th of March, 1981. Throughout this time, he endured the toughest of circumstances and humiliation. Mr. Abbas Amir-Entezam stood sham trial beginning on March 18, 1981, in Branch 1 of the Revolutionary Court with Ayatollah Mohammadi Gilani presiding. Mr. Amir-Entezam faced the court without a lawyer or a jury, access to the law, or any defense. The documents that were presented in court as evidence against Mr. Amir-Entezam were obtained from the occupied U.S. Embassy. Among the accusations was that Mr. Amir-Entezam had addressed the U.S. Ambassador with the phrase "dear" in his letters. The trial lasted several days. He was ultimately convicted of cooperating with the West by Ayatollah Mohammadi Gilani. The Ayatollah stated while addressing the court that: "Amir-Entezam is a foreign sympathizer!"

21. Mr. Amir-Entezam was in solidary confinement at the same time when American Embassy hostages were in captivity in Tehran. Amir-Entezam was arrested right after the was seized by Islamic Students, he stayed in solidary confinement until few months after the hostages were released by Islamic Republic of Iran.

22. Mr. Amir-Entezam served his sentence until his death in 2018, he served in several different prisons, behind whose walls he witnessed the events that shaped the dark first decade of the Islamic Republic of Iran. He became one of Iran's most well-known political prisoners, and international human rights defenders closely followed his situation throughout his imprisonment.

23. On March 16, 1993, Branch 7 of the public prosecutor's interrogation unit interrogated Mr. Amir-Entezam for meeting with Galindo Pohl, the representative of the UN's Human Rights Commission, who had a mandate to monitor Iran's human rights situation.

24. As a result of the meeting with Galinda Pohl, Mr. Amir-Entezam was detained in a safe-house with Kianoori and Maryam Firouz (Kianoori's wife) in order to keep them out of the prison system which might give them access to other prisoners and international visitors (such as Galindo Pohl).

25. In December of 1996, Mr. Amir-Entezam was moved to house arrest. But due to his activities he has been return to jail, and was between house arrest and jail until 2018. Since that time, in interviews and statements, Mr. Amir-Entezam has been outspoken against the Islamic Republic's illegal actions, especially those that took place while he was in prison.

26. After 17 years of official press silence about Mr. Amir-Entezam, a new reformist newspaper, Jameae, ran an interview with him in three installments from April 27 - 29, 1998.

The interviews were met with a barrage of attacks against the newspaper and resulted in new accusations against Mr. Amir-Entezam by the government of Iran. The Governor of Esfahan called Mr. Amir-Entezam's interview "a danger for national security" and "the Center for the Publication of the Documents of the Den of Spies," an agency devoted to reviewing the documents seized in the U.S. embassy ("the den of spies") takeover stated that Amir-Entezam's claims were false.

27. The Center for the Publication of the Documents of the Den of Spies, relying on books number 10 and 56 of "the den of spies" which the Students Following the Line of the Imam had translated and published from the U.S. embassy, outlined Amir-Entezam's new crimes as follows: "From the beginning of the 1960s [a reference to 17 years before the successful Islamic Revolution], Mr. Amir-Entezam has collaborated with a CIA agent named George Kiev who uses the pseudonym Adelisk. In the documents gathered, there are no details about the 1960s contact of Mr. Amir-Entezam with the CIA, so it appears that this contact was severed for some time..."

28. This new accusation against Mr. Amir-Entezam was lacking basic due process requirements. First, details and factual allegations do not appear in Mr. Amir-Entezam's charging documents, although the Center for the Publication of the Documents of the Den of Spies expresses no doubt that these contacts occurred. Second, it was not clear why the "contact" with the CIA was severed for a long period of time. Third, it is nonsensical that a relationship that took place 17 years before the revolution and the formation of the Iranian government referred to as the "Islamic Republic of Iran" could count as spying against that government, unless the Islamic Republic considers itself a continuation of the previous regime.

29. However, none of the aforementioned points could compete with Gholam Hossein Rahbarpour's press interview on May 19, 1998. The head of the Islamic Revolutionary court in Tehran referred to Mr. Abbas Amirentezam's claims, stating: "He is dead politically... Mr. Amir-Entezam's relationship with the U.S. intelligence service goes back to 17 years before the Islamic Revolution and he collaborated with that agency with the code SD Blad. Amir-Entezam has helped a great number of individuals to flee Iran including thousands of American citizens and their belongings…Amir-Entezam has questioned the role that the Students in the Line of Imam had in the takeover of the den of spies while Imam Khomeini has called this event the second revolution and a revolution that was bigger and deeper than the Islamic Revolution."

30. Mr. Rahbarpour, the head of the Islamic Revolutionary court in Tehran, added that Mr. Amir-Entezam had confessed to spying for foreigners and had admitted, "I provided foreigners with all of the documents relating to human rights in Iran." This "spying" was the newest accusation against Mr. Amir-Entezam. According to Mr. Rahbarpour, Mr. Amir-Entezam's illegal conduct that amounted to "spying" was that he had provided international organizations with documents regarding the violation of human rights.

31. In February of 1998, Mr. Amir-Entezam won the Bruno Kryski Foundation's International Human Rights Award for his resistance to the Iranian government and bravery throughout his predicament.

32. On April 22, 1998, Mr. Amir-Entezam wrote a letter criticizing the head of the Judiciary. A few months later, when Assadollah Lajevardi, the notorious former head of Evin prison and prosecutor of Tehran's Revolutionary Court, was assassinated, Mr. Amir-Entezam gave an interview to Voice of America in which he discussed Lajevardi's treatment of prisoners. Iranian officials reacted to Mr. Amir-Entezam's statements with anger and disapproval. The first reaction came from Hossein Ali Nairi, the under-secretary of the Supreme Court. He attached a transcript of Mr. Amir-Entezam's August 26, 1998 interview with VOA to an August 28, 1998 letter to Rahbarpour, the head of the Islamic Revolutionary court in Tehran. In addition to accusing Mr. Amir-Entezam of being against the revolution and Islam, Mr. Nairi claimed that Mr. Amir-Entezam had taken advantage of the mercy and kindness of the Islamic Republic and was angered that Mr. Amir-Entezam had the nerve to attack the sanctities of the Islamic System.

33. After a number of letters were exchanged between different judicial officials, on September 3, 1998, a court date was set and Mr. Amir-Entezam received a summons to appear in court on September 8, 1998 at 9 in the morning. On that date, Mr. Amir-Entezam was interrogated and then detained on charges of casting aspersions upon the revered Republic, publishing lies, and slander. Although he had his one million Toman in bail at the ready, Mr. Amir-Entezam did not accept the charges against him and voluntarily went to prison. The head of the court sent Mr. Amir-Entezam to Evin prison outside Tehran. On September 9, 1998, Mr. Amir-Entezam's wife surrendered a property bail to the court and the head of the court wrote a letter to Evin prison which stated that the accused was free to go since the bail had been delivered.

34. However, the head of Evin prison disregarded this order and refused to release Mr. Amir-Entezam. On the same day (September 9, 1998), the head of the court held an extraordinary meeting with Mr. Lajevardi's heirs. The head of the prison asked them if their complaint with Mr. Amir-Entezam was personal, or whether they were accusing him on the basis of his anti-revolutionary acts. All of the complainants claimed that they were filing complaints against Mr. Amir-Entezam on a personal basis.

35. In order to deal with the Lajevardi family's complaints, a hearing was scheduled for 11:30 am on October 3, 1998. Given that his bail had already been delivered and that the head of the court had issued the order for Mr. Amir-Entezam's release, his lawyers protested his continued imprisonment. Additionally, Mr. Amir-Entezam, his wife, and the human rights community wrote a letter to President Khatami on September 24, 1998 in which they protested the detention. Still, the head of Evin prison refused to release Mr. Amir-Entezam. The court session was held on October 3, 1998 as scheduled, yet the head of the court did not summon Mr. Amir-Entezam and wrote in the record of the hearing: "Despite the acceptance of the bail and the release announcement, the accused remains in detention and the circumstances of this detention are not yet clear for the court, but the accused was not present in the court session. Therefore, the necessities for dealing with the case are not met and it is required that a new time be reserved to deal with this matter and an inquiry be made into the situation of the accused."

36. On October 4, 1998, Mr. Rezai, the head of Evin Prison, wrote a letter to the head of court to tell him that the Revolutionary Court had another reason for holding Mr. Amir-Entezam in prison, and that the respected authority was about to dispatch another letter to him. More information, it seemed, was to come.

37. The letter in question was very likely the one dated October 7, 1998 from the sentencing judge of the Revolutionary Court, which was recorded in the office of Evin Prison on October 8, 1998. This letter refers to the letter dated September 10, 1998 (meaning two days after Mr. Amir-Entezam was detained) and a letter dated June 10, 1981. The Revolutionary Court judge's letter claimed that based on that decision against him, Mr. Amir-Entezam was sentenced to life in prison and had been recognized as corrupt on charges of conspiring to dissolve the Assembly of Experts, fighting the Velayat-e Faghih, helping the heads of the idolatrous regime to escape, having contact with Zionist investors, and giving information about the internal political situation of the country to the enemies of the Islamic Revolution. Thus, based on the issued

sentence, the judge reasoned that Mr. Amir-Entezam must stay in Evin and endure the punishment he had been sentenced to.

38. Indeed, Mr. Amir-Entezam remained in prison from that time, but despite the hard and bitter years of incarceration, his voice has not been silenced. Mr. Amir-Entezam's pleas for help have reached international authorities and human rights groups, and the government of Iran has repeatedly been asked about his case.

39. Although Mr. Amir-Entezam was in prison, he was never far from daily developments about his situation. Mr. Amir-Entezam would issue statements to mark various occasions, including the murder of the Frouhars, the anniversary of Dr. Mossadegh, and Nowruz every year. While these statements had little circulation inside the country, they had a noticeable impact and following outside of Iran.

40. In 2002, Mr. Amir-Entezam received medical furlough from Evin in order to undergo various surgeries to treat the numerous ailments he had acquired while in prison. With regional developments beginning at the start of 2003 and the growing crisis in Iraq, the situation inside Iran grew more sensitive at this time. Mr. Amir-Entezam's medical furlough was valid until the end of May 2003, but after writing a letter to the people of Iran suggesting a referendum during Nowruz, Mr. Amir-Entezam was returned to prison a month early, on April 26, 2003.

41. A few months later Mr. Amir-Entezam received permission to be removed to home arrest for the duration of his life sentence.

42. Mr. Amir-Entezam has won multiple national and international awards, including the International Human Rights Bruno Kreisky Prize in 1998 and the Jan Karski Award for Moral Courage in 2003.

43. On July 12, 2018, Mr. Amir-Entezam died in Tehran while serving his life sentence under house arrest. He died as Iran's longest serving prisoner of conscience having been incarcerated for nearly 40 years.

**INJURIES TO PLAINTIFFS**

44. Mr. Amir-Entezam was Iran's longest serving prisoner of conscience who served 38 years of a life sentence prior to his death in 2018. Throughout these years, he was tortured, held captive in solitary confinement for more than 500 days without trial, deprived of necessary medical treatment, exposed to harsh and degrading punishments, and lived apart from his family without any contact with his children for decades.

45. For seventeen years, Mr. Amir-Entezam had no visitation rights. When he was arrested his children were 3,6, and years old. They lived without access, or conversation with their father for seventeen years.

46. From the very start, Mr. Amir-Entezam faced humiliation while in captivity. For years he was not allowed to wear shoes and his children were not allowed to visit him. One humiliating ordeal that stood out to Mr. Amir-Entezam was a day when prison guards tied him and two of his cellmates — Reza Alijani and Taghi Rahmani, journalists and nationalist-religious activists — to a donkey and forced them to move through a crowd. Mr. Amir-Entezam was required to stay barefoot.

47. Mr. Amir-Entezam, on three separate occasions, was blindfolded and taken to the execution chamber, once being kept there for two full days while the Imam contemplated his death warrant. Mr. Amir-Entezam spent 555 days in solitary confinement in cells that were so overcrowded inmates took turns sleeping on the floor with each person rationed to three hours of sleep every twenty four hours. During his imprisonment, Mr. Amir-Entezam experienced permanent ear damage, developed spinal deformities, and suffered from various skin disorders.

48. Mr. Amir-Entezam's children, Plaintiffs Ardeshir, Anoush, and Elham moved to the United States in 1983. Due to their father's incarceration in Iran, they grew up with a single mother, with limited income. While Mr. Amir-Entezam was a relatively wealthy man, his company and properties were seized by government of Iran upon his arrest. Therefore, his family had no access to any income or money from Mr. Amir-Entezam and they were forced to grow up on the border of the poverty line. Instead of participating in school activities, Plaintiffs had to work from an early age in order to support themselves and their family. There were times that they had to walk miles every day in order to take a bus to work and to school and then get back home every day.

49. Plaintiffs were suffering in the absence of Mr. Amir-Entezam and the income he provided for his family, and they had no communication with Mr. Amir-Entezam throughout his time in jail. For years, plaintiffs did not know whether Mr. Amir-Entezam had been executed or whether he was alive. Everyday they were questioning the status of their father, while dealing with financial hardship that his imprisonment has caused.

50. For the last thirty-nine years, since the time of Mr. Amir-Entezam arrest, Plaintiffs' never lived the normal life. Plaintiffs education was affected significantly by the absence of their father

and provider, and consequently their job opportunities and income were negatively affected. Professionally Plaintiffs have collectively had difficulty with maintaining careers due to the stress and psychological issues caused by Iran's actions as related to the situation with their father, Mr. Amir-Entezam.

51. Furthermore, Plaintiffs could not even attend the funeral of their father in Iran.

52. As a direct result of Mr. Amir-Entezam's illegal confinement, torture, and killing, Plaintiffs were deprived of the love, support and comfort of their father throughout the duration of his detention in Iran.

53. Furthermore, another direct result of Mr. Amir-Entezam's illegal confinement, torture, and killing, Mr. Amir-Entezam was deprived of the love, support and comfort of his children throughout the last thirty-eight years of his life.

54. As another result of Mr. Amir-Entezam's confinement, torture, and killing, Plaintiffs suffered and have been treated for medical and psychological issues throughout the last thirty nine years, from the time their father was seized in Iran up and to the current date.

55. Plaintiffs' pain, anguish, and anxiety are likely to persist for years to come. Plaintiffs fear that Iran will retaliate in some fashion against them or their family members for filing this Complaint.

56. Plaintiffs' injuries extend well beyond the deep and lasting psychological impacts of Iran's crimes.

57. Despite the severity of their injuries, Plaintiffs are committed to putting their lives back together. One critical element of this effort is holding Defendants accountable in this Court for the terrorism, torture, and other abuses they committed against Mr. Abass Amir-Entezam. Congress enacted the "terrorism exception" to the FSIA for exactly this circumstance—to provide plaintiffs with an "economic weapon" against rogue states that "consider terrorism a legitimate instrument of achieving their foreign policy goals." H.R. Rep. No. 104-383, at 62 (1995). For nearly forty years, Iran held and terrorized Mr. Amir-Entezam and his family for its fight against United States. Plaintiffs seek justice and redress from this Court in order to compensate Plaintiffs for their pain and suffering and to hold Iran accountable for its heinous and unlawful acts of terrorism, torture, and abuse.

## COUNT I

## 28 U.S.C. 1605A(c), PRIVATE RIGHT OF ACTION

58. Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

59. Iran was a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).

60. Defendants and their agents were acting within the scope of their office, employment, or agency in committing the acts alleged herein, including hostage taking, torture, and extrajudicial killing of Mr. Abass Amir-Entezam.

61. As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of IRGC and its agents, whose acts were funded and directed by the Islamic Republic of Iran, Plaintiffs suffered, inter alia, death, physical pain and suffering, mental anguish, emotional pain and suffering, and/or economic losses resulting from Defendants' acts.

62. Pursuant to 28 U.S.C. § 1605A(c), Plaintiffs, who are foreign national employees of the U.S. Government and their family members, may assert a cause of action against Defendants for personal injury or death that was caused by an act of extrajudicial killing or the provision of material support or resources for such an act, if performed or provided by an official, employee, or agent of Defendants while acting within the scope of his or her office, employment, or agency.

63. Accordingly, as a result of Defendants' actions, Plaintiffs seek compensatory damages. WHEREFORE, Plaintiffs demand that judgment be entered, jointly and severally, against Defendants in the amount of One Hundred Million US Dollars ($100,000,000.00).

## COUNT II
## ASSAULT AND BATTERY

64. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

65. "An actor is subject to liability to another for assault if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension." Restatement (Second) of Torts § 21 (Am. Law Inst. 1965).

66. Hostage taking and torture under the FSIA constitute assault because "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm." Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 76 (D.D.C. 2010).

67. Mr. Amir-Entezam was held hostage and tortured by Defendants, resulting in harmful contact and fear of such harmful contact.

68. While in Defendants' custody, Mr. Amir-Entezam was routinely subjected to harmful and offensive contact, including being forcibly moved at gunpoint, being forced to wear a blindfold, and other forms of torture.

69. While in Defendants' custody, Mr. Amir-Entezam was frequently threatened with harmful and offensive physical contact, including death and dismemberment. These threats caused Amir-Entezam to experience imminent apprehension that he could be killed, tortured, abused, or otherwise physically and emotionally injured. He constantly feared for his health and safety.

## COUNT III
## FALSE IMPRISONMENT

70. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

71. "(1) An actor is subject to liability to another for false imprisonment if (a) he acts intending to confine the other or a third person within boundaries fixed by the actor, and (b) his act directly or indirectly results in such a confinement of the other, and (c) the other is conscious of the confinement or is harmed by it." Restatement (Second) of Torts § 35.

72. The unlawful arrest and imprisonment of Mr. Amir-Entezam by Defendants constitutes false imprisonment. See, e.g., Jenco, 154 F. Supp. 2d at 34; Sutherland, 151 F. Supp. 2d at 49.

73. Defendants unlawfully detained Mr. Amir-Entezam in Evin Prison, an institution that is known in Iran and internationally for its brutal mistreatment of hostages, political prisoners, and human rights defenders. Mr. Amir-Entezam also was under house arrest. Mr. Amir-Entezam was aware of this illegal detention. Mr. Amir-Entezam has suffered physical, economic, emotional, and psychological harm as a result of this illegal detention.

## COUNT IV
## HOSTAGE TAKING

74. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

75. The FSIA confers jurisdiction on the courts and creates an independent federal cause of action to recover for injuries sustained as a result of terrorist acts, such as hostage taking or torture. Under the statute, Plaintiffs must prove that (1) there was an act of "hostage taking" or "torture"; (2) the act was committed by the foreign state or "an official, employee, or agent of such foreign state"; (3) the act "caused" (4) "personal injury or death" (5) "for which the courts of the United States may maintain jurisdiction under this section for money damages." 28 U.S.C.

§ 1605A(a)(1) & (c); accord Valencia v. Islamic Republic of Iran, 774 F. Supp. 2d 1, 10-11 (D.D.C. 2010).

76. Seizing an individual in an effort to extract information against himself and others is hostage taking within the definition of the FSIA.

77. Mr. Amir-Entezam was seized by Defendants on 1979, when he was serving as Iran's ambassador to Sweden and other Scandinavian countries. He was summoned by Mr. Kahrazi, asking Mr. Amir-Entezam to visit Iran by request of the Prime Minister, which was a trick to bring him back to Iran. Upon his arrival, he was unexpectedly arrested, charged with "spying for the CIA" and "connections with the US," based on documents that the court claimed were discovered at the occupied US embassy. For more than 15 months, Mr. Amir-Entezam awaited trial without access to visitors, a lawyer, or the details of the case against him. Two days after Mr. Amir-Entezam's arrest, the students who were occupying the US embassy in Tehran brought charges against him based on documents found at the embassy. It was through them that the news of his arrest was published. After those 15 months, the prosecutor's office and judicial officials kept completely silent about the charges against him.

78. There is significant and compelling evidence that Mr. Amir-Entezam was tortured to be compelled to present forced and falsified testimony against the United States, and his activities.

79. Mr. Amir-Entezam's prolonged detention resulted in physical injuries, including severe prostate infection, hemorrhaging and scrotal edema (swelling) has been denied urgent medical care by the authorities at Evin prison, Tehran. He was denied necessary medical care and medication. During his detention, he may have been exposed to asbestos, mold, and other environmental toxins, with unknown health effects.

80. Mr. Amir-Entezam suffered from acute psychological and emotional injury and other pain and suffering as a direct result of his detention and abuse—including solitary confinement, lack of medical care, inadequate nutrition, relentless interrogations, physical distress, intimidation and disorientation, and denial of due process. While in prison and house arrest, Mr. Amir-Entezam experienced depression, hallucinations, and suicidal ideations. He had trouble sleeping and has experienced issues with concentration as well as other symptoms of post-traumatic stress disorder. His relationships with his family have been permanently compromised by his experiences during his unjust and illegal imprisonment.

81. Finally, Mr. Amir-Entezam died, either by direct act of government or as a consequence of prolonged torture and his captivity.

## COUNT V
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS/ SOLATIUM

82. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

83. "An actor who by extreme and outrageous conduct intentionally or recklessly causes severe emotional harm to another is subject to liability for that emotional harm and, if the emotional harm causes bodily harm, also for the bodily harm." Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 46; accord Valencia, 774 F. Supp. 2d at 14; Acosta, 574 F. Supp. 2d at 28.

84. When a defendant's conduct is directed at a third person, the Restatement generally requires that a plaintiff be a "close family member" and have "contemporaneously perceive[d] the event." Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 46 cmt. m; accord Valencia, 774 F. Supp. 2d at 14.

85. "All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience." Heiser, 659 F. Supp. 2d at 27 (quoting Stethem, 201 F. Supp. 2d at 89).

86. Because Mr. Amir-Entezam was taken hostage and tortured, Plaintiffs need only demonstrate that they are close family members, and that emotional distress did result, in order to state a valid theory of recovery for intentional infliction of emotional distress. See Roth, 78 F. Supp. 3d at 401.

87. Defendants' extreme and outrageous conduct in holding Mr. Amir-Entezam hostage and inflicting torture upon him, and taking his life caused his children, Plaintiffs, to suffer from severe emotional harm, including depression, persistent feelings of guilt, loss of sleep, paranoia, loss of focus, and other symptoms of post-traumatic stress disorder, including thoughts of suicide.

## COUNT VI
## LOSS OF PROPERTY

88. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

89. The FSIA allows for recovery for "reasonably foreseeable property loss … by reason of the same acts on which the action … is based." 28 U.S.C. § 1605A(d). Section 1605A(d) "contains two causation elements: (1) the property loss must come 'by reason of' the [hostage

taking or torture], and (2) the property loss must be a 'reasonably foreseeable' result of [hostage taking or torture]." Oveissi v. Islamic Republic of Iran, 879 F. Supp. 2d 44, 57 (D.D.C. 2012).

90. As a result of his unlawful arrest and detention, Mr. Amir-Entezam was unable to work and removed from his positions. He has lost his construction business. Mr. Amir-Entezam has incurred significant expenses, including the loss of rent, property, and deposits, as a result. These losses occurred "by reason of" and were a "reasonably foreseeable" result of his arrest and detention.

91. Plaintiffs expended significant time and resources in order to secure Mr. Amir-Entezam's release and provide Mr. Amir-Entezam with legal and financial support while under arrest. These expenses and opportunity costs occurred "by reason of" and were a "reasonably foreseeable" consequence of Defendants' hostage taking and torture of Mr. Amir-Entezam.

92. Plaintiffs didn't receive the financial support otherwise would have been available to them, and they did not inherit any wealth from their father.

93. The medical bills and expenses of Mr. Amir-Entezam while on house arrest was paid by Mr. Amir-Entezam's left alone properties, yet as the consequence of prolonged medical expenses, his funds were depleted during his decades of house arrest.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

94. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

95. By establishing that he was taken hostage or tortured by Defendants and that emotional distress resulted, Mr. Amir-Entezam (or his family) has established his right to recovery for intentional infliction of emotional distress. See Roth, 78 F. Supp. 3d at 400-401; Valencia, 774 F. Supp. 2d at 14.

96. Defendants' conduct in holding Mr. Amir-Entezam hostage and inflicting torture upon him caused Mr. Amir-Entezam to suffer severe emotional harm, including depression, suicidal ideation, symptoms of post-traumatic stress disorder, and irreparable harm to his relationships with his wife, his daughters, and other friends and family.

## COUNT VIII
## WRONGFUL DEATH

97. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

98. As a direct and proximate result of the above described acts of Defendant the Decedent, Abass Amir-Entezam, suffered an untimely death on July 12, 2018.

99. As a direct and proximate result of the wrongful death of Siamak Pourzand, the Plaintiff, Azadeh Pourzand, has been deprived of her father's society, companionship, comfort, protection, care, advice, attention, counsel, support, financial support, economic loss, guidance and suffered and continues to suffer mental anguish and emotional pain and suffering as well as all other damages recoverable under state and federal law.

## COUNT VIII
## PUNITIVE DAMAGES

100. The Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

101. The actions of the Islamic Republic of Iran, who has been committing, sponsoring, and supporting acts of international terror against international and domestic target, and was designated as a State Sponsor of Terror for decades.

102. The acts of the Defendants, and each of them, carried out by their agents as described above, were malicious, willful, unlawful and in wanton disregard of life and the standards of law that govern the actions of civilized nations. The loss of life as above described was intended as a result by each Defendant. Mr. Amir-Entezam and each of his family members are each victims of the acts of terror committed by Iran with the material support of each of the Defendants. In accordance with the provisions of 28 U.S.C §1605A(c) the Plaintiffs are thereby entitled to a maximal award of punitive damages to the fullest extent of the law.

103. Iran, as a country with history of human rights abuses and sever violations of International law, caused pain to many who were promoting internationally acceptable norms and human rights. Many Iranian and foreigners, including Americans, lost life, liberty, health, and property due to continued act of terror conducted by Iran.

104. This case is among few bringing light to domestic act of terror by Iran against human right activists and those fighting the brutal regime of Iran. The punitive penalty of such activities should be so high to prevent Iran from violating international human rights, torturing individuals, taking hostages, and extrajudicial killings. Iran has a defenseless record of human right abuses; it has been condemned internationally by each and every United Nation Commission. Unfortunately, there was no penalty imposed to Iran for its violation, for similar cases in hand.

WHEREFORE, the Plaintiffs pray that judgment be entered, jointly and severally, against the Islamic Republic of Iran, on behalf of each Plaintiff, in the amount of one billion US Dollars ($1,000,000,000) for each of them, as against each of the Defendants, jointly and severally, and their costs herein expended.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against all Defendants and respectfully request the following relief:

105. Mr. Amir-Entezam's family is entitled to compensatory damages for personal injury, assault, battery, unjust imprisonment, and extrajudicial killing (wrongful death) suffered as a result of hostage taking and torture.

106. Mr. Amir-Entezam and defendants are entitled to solatium damages for Mr. Amir-Entezam's detention (under 28 U.S.C. § 1605A(c)).

107. All Plaintiffs are entitled to special damages and other compensation for property loss suffered as a result of Mr. Amir-Entezam's detention, torture, and extrajudicial killing.

108. All Plaintiffs are entitled to consequential damages for their lost earning potential and other long-term damages.

109. All Plaintiffs are entitled to aggravated damages for Defendants' cruelty, torture, and abuse.

110. All Plaintiffs are otherwise entitled to general damages and all other applicable damages.

111. Punitive damages should be assessed (under 28 U.S.C. § 1605A(c)).

112. The Court should award Plaintiffs their full costs and attorneys' fees as incidental damages and as otherwise appropriate.

113. The Court should grant such further and other relief as this Court deems just and proper.

Dated: July 11, 2019

Respectfully submitted,

\_\_/S/ *Ali Herischi*_____

Ali Herischi, Esq. (MD0024)
Herischi & Associates LLC
7201 Wisconsin Ave., Suite 450
Bethesda, Maryland 20814
Phone: 301-363-4540
Fax: 301-363-4538
*Attorney for Plaintiffs*