## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **ARDESHIR AMIRENTEZAM,** *et al.,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Case No: 1:19-cv-02066 (EGS/GMH)** |
| | ) | |
| **THE ISLAMIC REPUBLIC OF IRAN,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

Anoushiravan Amirentezam ("Anoush"), Ardeshir Amirentezam ("Ardeshir"), and Elham Entezam Breuer ("Elham") (together, "Plaintiffs") are the children of Abbas Amir-Entezam ("Amir-Entezam"), a former Iranian diplomat and businessman.  They bring this action under the state sponsor of terrorism exception ("terrorism exception") to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1695A, seeking to hold the Islamic Republic of Iran ("Iran") and the Islamic Revolutionary Guard Corps ("IRGC") liable for their emotional and economic injures after their father was allegedly taken hostage and tortured by Defendants for nearly four decades.  ECF No. 26 at 1, 2, 4–6.  Defendants failed to appear to defend this action and Plaintiffs filed a motion

for a default judgment.  After a thorough review of the record,[1] the undersigned grants their motion and awards a total of $6.5 million in damages each.[2]

## I.  BACKGROUND[3]

Amir-Entezam has been called Iran's longest-held political prisoner.  ECF No. 5, ¶ 44; ECF No. 26 at 2.  He was arrested in 1979, shortly after students took over the United States Embassy in Tehran, convicted in 1981 of "cooperating with the West," and detained in various prisons or under house arrest until his death in 2018.  ECF No. 5, ¶¶ 19–20, 22; ECF No. 26 at 2–4.

### A.  Amir-Entezam's Arrest

Amir-Entezam was born in 1932 in Iran and later attended university in the United States.  ECF No. 5, ¶ 15.  After the fall of the Iranian monarchy in February 1979, Amir-Entezam served as deputy prime minister for the interim government and was later appointed ambassador to

---

[1] This case has been assigned to the undersigned for all purposes pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  *See* ECF Nos. 19, 21.  The most relevant docket entries for the purposes of this Memorandum Opinion are (1) the Amended Complaint (ECF No. 5) and (2) the motion for default judgment and its exhibits (ECF No. 26).  All page numbers referenced herein are those assigned by the Court's CM/ECF system.

[2] After Plaintiff consented to the jurisdiction of a magistrate judge for all purposes, Judge Sullivan referred this matter to the Court pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  *See* ECF Nos. 19, 21.  Under the Federal Magistrate Act, magistrate judges may, with the consent of the parties, preside over "any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court."  28 U.S.C. § 636(c)(1).  A party may, through conduct, impliedly consent to a magistrate judge's jurisdiction.  *Roell v. Withrow*, 538 U.S. 580, 591 (2003).  On this basis, courts in this Circuit have found a party's default effected consent to a magistrate judge's jurisdiction to decide a motion for default judgment.  *See Est. of Parhamovich v. Syrian Arab Republic*, No. 17-cv-61, 2022 WL 18071921, at *1 n.2 (D.D.C. Dec. 28, 2022); *Koch Minerals Sàrl v. Bolivarian Republic of Venezuela*, 514 F. Supp. 3d 20, 38 (D.D.C. 2020); *Radmanesh v. Gov't of Islamic Republic of Iran*, No. 17-cv-1708, 2019 WL 1787615, at *1 (D.D.C. Apr. 24, 2019), *aff'd sub nom. Radmanesh v. Islamic Republic of Iran*, 6 F.4th 1338 (D.C. Cir. 2021); *Baker v. Socialist People's Libyan Arab Jamahirya*, 810 F. Supp. 2d 90, 98 (D.D.C. 2011) ("[D]efaulting nullifies any right to argue the absence of the magistrate judge's jurisdiction . . . ."); *see also Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 682–85 (2015) (applying *Roell*'s implied consent standard and holding that a bankruptcy judge may enter default judgment against an absent party where their defaulting conduct evinces consent to the bankruptcy judge's jurisdiction).

[3] The following background relies on the allegations of the complaint, assertions in the motion for default judgment, and information from the exhibits supporting the motion without regard to questions of admissibility.  Admissibility issues are discussed primarily in Section II, *infra*.

Sweden and other Scandinavian countries.  ECF No. 5, ¶ 16; ECF No. 26 at 2.  In December 1979, Iranian students occupied the United States Embassy in Tehran, taking dozens of American hostages.  ECF No. 5, ¶ 13; ECF No. 26 at 2 & n.1.  Shortly thereafter, the Iranian Foreign Ministry requested Amir-Entezam's immediate return from Sweden for "consultation" on certain diplomatic issues.  ECF No. 5, ¶ 18.  Upon his return to Iran in December 1979, he was arrested for allegedly "spying for the CIA" and maintaining "connections with the US" based on documents apparently found at the occupied U.S. embassy.  ECF No. 26 at 2 & n.3; *see also* ECF No. 5, ¶ 19. At the time, Amir-Entezam's children—Anoush, Ardeshir, and Elham—were 3, 5, and 9 years old, respectively.  ECF No. 26 at 2 & n.7.

### B.    Amir-Entezam's Detention

After his arrest, Amir-Entezam was held in solitary confinement for over one year, without access to legal counsel or family.  ECF No. 5, ¶¶ 19–20; ECF No. 26 at 2–3.  He stood trial in March 1981 and was ultimately convicted of espionage and sentenced to life in prison.  ECF No. 5, ¶ 20; ECF No. 26 at 3 & n.8.  He was held in Evin Prison, which is "internationally recognized as a site of human rights abuses against prisoners," until 1997.  ECF No. 26 at 3 & n.10, 18 & n.67. At that point, he was moved from Evin Prison to house arrest due to medical needs.  *Id.* at 3 & n.15.  However, he was returned to Evin Prison in 1998 for "casting aspersions" on the Islamic Republic of Iran.  ECF No. 5, ¶ 33; ECF No. 26 at 3 & n.16.  Amir-Entezam received a medical furlough in 2002 but was again reimprisoned in April 2003.  ECF No. 5, ¶ 40; ECF No. 26 at 3–4 & n.17.  A few months later, he was released to house arrest for the remainder of his sentence. ECF No. 5, ¶ 41.  In 2015 and 2017, he was allowed to travel abroad for medical treatment and was able to see his children, who are Plaintiffs here.  ECF No. 26 at 4 & n.22.  Amir-Entezam died in July 2018, while under house arrest.  ECF No. 5, ¶ 43; ECF No. 26 at 4 & n.23.

In 1983, Plaintiffs moved to the United States.  ECF No. 5, ¶ 48.  Because the government of Iran seized Amir-Entezam's property upon his arrest, Plaintiffs grew up in near poverty.   ECF No. 26 at 5 & n.26; *see also* ECF No. 5, ¶ 48.  More, for a significant period of Amir-Entezam's incarceration, Plaintiffs were unable to communicate with him and were unaware of whether he was alive or dead.  ECF No. 5, ¶ 49; No. 26 at 4 & n.24.  Although he was transferred to house arrest in 2003, Plaintiffs were unable to visit him in Iran—even for his funeral—for fear of their own safety; rather, they were physically reunited with him only in 2015 and 2017, when he travelled abroad for medical treatment.   ECF No. 26 at 4–5 & nn.22, 25; *see also* ECF No. 5, ¶ 51.

## II.   TESTIMONY AND OTHER EVIDENCE[4]

### A.   Plaintiffs' Testimony

#### 1.   Elham Entezam Breuer

Elham, the daughter and oldest child of Amir-Entezam and his first wife, testified by declaration dated October 31, 2022.  *See generally* ECF No. 26-5.  Elham was born September 16, 1970 in Tehran.  *Id.*, ¶ 3.  She became a U.S. citizen in December 1993.  *Id.*, ¶ 13.  She had a close relationship with her father, whom she idolized for his strength, bravery, intelligence, kindness, and charm.  *Id.*, ¶ 4.  When she was approximately four-and-a-half years old, Amir-Entezam sent her to live in California with family friends in order to "end the instability in [her] life because he couldn't be there for [her] himself."  *Id.*, ¶ 5.  The separation was wrenching.  *Id.*, ¶¶ 6–7.  Then, at the end of Elham's second-grade year, Amir-Entezam was appointed ambassador to Scandinavia, and she moved to Stockholm, Sweden, to live with him, her stepmother, and her two half-brothers, Anoush and Ardeshir.  *Id.*, ¶ 8.

---

[4] This section focuses on the admissible evidence Plaintiffs have submitted, largely excluding evidence that is inadmissible hearsay.

Although Elham resided in Stockholm until near the end of her seventh-grade year, she lived with her father for only nine months of that time.  *Id.*, ¶ 8.  In December of 1979, when she was nine years old, Amir-Entezam "left for a business trip to Iran, never to return," and she did not see him for another 35 years.  *Id.*, ¶¶ 9, 23.  Immediately prior to his recall to Tehran, Elham was apprehensive and remembers many dignitaries and businesspeople warning him not to return, as it was not safe.  *Id.*, ¶ 10.  She begged him not to go, but he assured her that "everything would work out."  *Id.*, ¶ 11.  The day her father was arrested began "a whole new dark chapter in [her] life."  *Id.*, ¶ 12.  When her stepmother told her that he had been arrested, Elham avers that she was "numb, so scared, and a rush of coldness took over and [she] began freezing from the inside."  *Id.*  She could not "move, eat, or sleep."  *Id.*  During those years in Sweden, she had suicidal ideation and went from an "A" student to bringing home low grades as she watched her stepmother "struggle[ ] to cope with suddenly having to raise her two sons and [Elham] on her own."  *Id.*, ¶ 13.

In 1983, her stepmother moved to the United States with her half-brothers and Elham was reunited with her mother, who was living in Seattle, Washington.  *Id.*, ¶ 13.  Elham's mental health did not improve, however.  She continued to be "a mess" and "never knew stability again."  *Id.*, ¶ 14.  She suffered from depression and attempted suicide.  *Id.*  She attended college at Washington State University but was unable to "keep up with the pace of the school" and dropped out in her first year.  *Id.*  She became a U.S. citizen in December 1993.  *Id.*, ¶ 13.  As an adult, it has been difficult for her to keep a job and she lived "paycheck to paycheck" through her twenties.  *Id.*, ¶ 15.  She has struggled with interpersonal relationships and suffers from fear, paranoia, and panic attacks "as a result of [her] father's treatment."  *Id.*, ¶ 16.  In the mid-1990s, she received a letter from a reporter "detailing the torture [her] father was experiencing," which led to a "huge mental

breakdown" preventing her from leaving the house for a month. *Id.*, ¶ 17. She has regularly sought mental health treatment. *Id.*

Elham stated that her father experienced "unimaginable" suffering.[5] *Id.*, ¶ 18. According to Elham, "[i]n the early days of his imprisonment while he was still in solitary confinement, he was injected with a chemical by his captors that caused him to throw up and experience extreme dizziness," so that "for about six months [ ] he was unable to walk and had to crawl around on the floor." *Id.*, ¶ 18. Amir-Entezam was reportedly kept in overcrowded cells with dangerous criminals and "in a cell so small that he could not even sit up straight." *Id.*, ¶¶ 19, 21. After he met in prison with a representative of the United Nations, officials retaliated by forcing him into a cart and transporting him "through the cold winter air at night across the prison, causing an ear infection and pneumonia which both went untreated, leading to permanent hearing loss." *Id.*, ¶ 20. Elham also stated that, "[o]n multiple occasions, his jailers told him that he would be executed by gun or hanging, going so far as to put the rope around his neck or force him into coffins, only to then tell him that the execution would not come that day." *Id.* According to his daughter, Amir-Entezam endured more than 27 surgeries in his life as a result of his treatment in prison and spent the last years of his life in a wheelchair, "unable to use his legs." *Id.*, ¶ 21.

---

[5] According to Elham, she learned the information about her father's hardships from a "reporter and conversations with [her] father." ECF No. 26-5, ¶ 18. As such, it is inadmissible hearsay to the extent it is offered to prove the treatment Amir-Entezam endured while in prison. *See* 30B Charles Alan Wright, *et al.*, Federal Practice and Procedure § 6718 (2023 ed.) ("Under the federal hearsay definition, and out-of-court statement is only hearsay if it is offered to prove 'the truth of the matter asserted' by the out-of-court declarant." (quoting Fed. R. Evid. 801(a)(2))). However, to the extent that the information is offered to show how statements about her father's suffering affected Elham, which is relevant to her claim for solatium damages, it is admissible. *See id.* § 6719 ("Often an out-of-court statement is relevant for the effect it had on someone who heard it. The party offering the statement can use this theory of relevance—that the statement provoked some relevant reaction, knowledge, or belief on the part of a person who heard it—to overcome a hearsay objection. Assuming the statement is, in fact, relevant to show its effect on the listener, and offered for that purpose, the statement is not hearsay."); *see also, e.g.*. *Claud v. Brown Harris Stevens of Hamptons, LLC*, __ F. Supp. 3d __, __, 2023 WL 3858677, at *15 n.14 (E.D.N.Y. June 7, 2023) (receiving into evidence testimony about conversations the plaintiff had with third parties "not for their truth, but for their effect on the listener . . . in support of her claims of emotional distress").

      2.     Ardeshir Amirentezam

Ardeshir, Amir-Entezam's son and middle child, testified by declaration dated October 31, 2022. *See generally* ECF No. 26-3. He was born in Tehran on January 23, 1974. *Id.*, ¶ 3. In February 1996, at the age of 22, he became a U.S. citizen. *Id.*, ¶ 16. Ardeshir "admired [his father] from a young age" and "always felt safe" when he was around. *Id.*, ¶ 5. But when he was five years old, his father "in a split moment was taken out of [Ardeshir's] life," plunging him into an "abyss of darkness and a path of the unknown" and "stripp[ing] away [his childhood] immediately." *Id.*, ¶¶ 4, 9. After Amir-Entezam was arrested, Ardeshir and his siblings "knew that [their] life had turned upside-down overnight" and that "something terrible had happened to [their father] and he would probably not be coming back due to his politics." *Id.,* ¶ 7. He feared for his safety and that of his family because "there was a chance [they] could be taken and used against [Amir-Entezam] to force a confession." *Id.*, ¶ 9. After his father's arrest, his construction company closed and the Iranian government confiscated its heavy machinery, as well as two of his father's properties in Tehran. *Id.*, ¶ 8. The family was "left with almost nothing" and lived near poverty in Stockholm after vacating the embassy. *Id.*, ¶¶ 7–8. According to Ardeshir, "unofficial reports" estimate that Amir-Entezam's assets at the time of his arrest would currently be worth approximately $4,000,000. *Id.*, ¶ 8.

When Ardeshir was nine years old, the family "in the middle of the night packed up what little [they] could carry" and traveled to Los Angeles, but that "was only the beginning of a journey of hardship, obstacles, pain, suffering, and tests." *Id.*, ¶ 10. His mother was "very strict" because of her fear and stress, causing Ardeshir "to experience physical and mental abuse that lasted for years into [his] adulthood." *Id.*, ¶ 12. He became unstable, depressed, angry, and confused. *Id.* Ardeshir took on the role of provider once they moved to Los Angeles and "was put to work as

early as [twelve] years old," working seven days per week, sometimes at two or three different jobs while attending school.  *Id.*, ¶ 13.  At the age of twenty, he was involved in a serious car accident, but continued to work even with multiple injuries.  *Id.*, ¶ 14.

Ardeshir was unable to speak to his father from the time he was five years old until he was twenty-one, when he was "finally allowed to talk to him on the phone."  *Id.*, ¶ 15.  He stated that, "as a young man with no father to look up to for direction, [his] path became ever more unclear." *Id.*, ¶ 18.  He was unable to finish college or start a career.  *Id*, ¶ 17.  Instead, he worked a series of odd jobs and "tried many times to come up with business ideas in order to create some opportunity," but they have all failed.  *Id.*, ¶ 17.  When he was 34, he "lost everything" due to a bad business partnership and was homeless for ten months.  *Id*, ¶¶ 17–18.  He was then able to find a job at a restaurant, at which he is still employed.  *Id.*, ¶¶ 19, 22.

Ardeshir next saw his father in person when he was 41 years old, and it was "more like meeting a character [he'd] heard or read about than reuniting with [his] father."  *Id.*, ¶ 20.  That meeting was not "a chance . . . to make up for lost time or to try to [ ] create the deep relationship [they] had never gotten to continue building," but rather "a chance for [Ardeshir] to give peace to [the] man who had once been [his father]," to "take care of him, not to mourn the loss of care [Ardeshir] should have been able to receive from him."  *Id.*, ¶ 21.

### 3.   Testimony of Anoush Amirentezam

Anoush, Amir-Entezam's youngest child and son, testified by declaration dated October 31, 2022.  *See generally* ECF No. 26-4.  He was born in Tehran on September 9, 1976.  *Id.*, ¶ 3. He became a U.S. citizen in February 1996, when he was 20 years old.  *Id.*, ¶ 4.  Although he was only three years old when his father was arrested, Anoush remembers "walks in the park and playing games with [his] father," as well as "the fear [they] felt as [they] saw the violence in [Iran]

start to escalate." *Id.*, ¶ 6.  When his father was taken, "he knew immediately that something terrible had happened and that [his father] was not coming back," which caused "trauma[ ] for [him] as a young boy." *Id.*  In the years in Sweden after his father's arrest, the family lived in near poverty and struggled with the loss of their "lifeline, support system, and role model." *Id.*, ¶ 7.

Anoush, Ardeshir, and their mother "had nothing" when they moved to Los Angeles in 1983 and they "struggled with adapting to life in the U.S. coming from a country that had just been through such upheaval." *Id.*, ¶ 8.  They also lived near poverty in the United States and Anoush and Ardeshir had to change schools periodically because their mother lost her job or had to take another position in a different area, leading to "sadness and depression." *Id.*, ¶ 9.  The family was able to share the pain of "having a relative locked away and abused by the [Iranian] regime" with the tight-knit Iranian community, but that sometimes led to supporters of the regime "getting ahold of [their] phone number and calling the house." *Id.*, ¶ 11.  Anoush was fearful throughout his childhood and teen years not only that his father would be killed, but also that the rest of his family was in danger from the regime. *Id.*, ¶ 12.

Anoush was bullied by other schoolchildren because he was poor and he "had no father." *Id.*, ¶¶ 15, 17.  "[N]ightmares were common" and he "frequently sleepwalked out of bed and some-times into the streets." *Id.*, ¶ 16.  In high school and college he suffered from panic attacks from stress caused by the need to succeed at school because "not succeeding wasn't an option." *Id.*  His mother was physically abusive and "would physically punish [her children] for average little dis-obediences." *Id.*, ¶ 17.  Although Anoush was able to complete college, earn a J.D., and build a career, "[t]he pain and struggles that [he] had as a child carried over into [his] adult life" and he has "suffered from nightmares and anxiety for most of [his] life." *Id.*, ¶ 22.  The two brief visits

Anoush was able to have with his father "couldn't begin to heal the harm that [the family has] experienced." *Id.*, ¶ 26.

### B.    Other Fact Testimony

#### 1.    Testimony of Gordon Breuer

Gordon Breuer, who has been married to Elham since 2006, testified by declaration dated August 1, 2021. *See generally* ECF No. 26-6. His declaration addresses both Elham's reaction to her father's imprisonment and reports about her father's treatment while detained. In general, Breuer asserted that Elham had a "profound" emotional attachment to her father and was traumatized both by her father's imprisonment and by "the experience of seeing other high-profile Iranians in her father's circle be arrested and even killed by the Iranian government." *Id.*, ¶¶ 8–9. When Elham learned in the mid-1990s about her father's treatment in prison, she "had a nervous breakdown," quit her job, and sought therapy. *Id.*, ¶ 10. She continues to suffer "the effects of PTSD," including "frequent nightmares that often wake her screaming from her sleep, difficulty sleeping in general, lack of confidence, and severe fear and paranoia that her family was being monitored and might be harmed by the Iranian government," as well as difficulty trusting and opening up to others. *Id.*, ¶¶ 5–6, 10. Breuer reports that when Elham saw Amir-Entezam in 2015 for the first time in many years, "there was a total collapse." *Id.*, ¶ 16. Seeing Amir-Entezam again in 2017 "changed" Elham, making her more confident and more committed to parenting her child. *Id.*, ¶ 17. However, when Amir-Entezam "comes up in the news, the fear resurges."[6] *Id.*

---

[6] Breuer's declaration also includes information he learned from "news articles and [Amir-Entezam's] own public and private communications" about Amir-Entezam's suffering while detained. *See* ECF No. 26-2, ¶¶ 11–12. As discussed above, *see supra* note 5, that testimony is inadmissible to prove Amir-Entezam's treatment at the hands of Iranian officials. Moreover, its effect on Breuer is not relevant to any issue in this case, as he is not a plaintiff and has no claim for emotional distress damages. It is therefore not admissible for any purpose.

2.      Testimony of Cassie Murvay

Cassie Murvay, a friend of Elham's since college, testified by declaration dated August 9, 2021.  *See generally* ECF No. 26-7.  She asserted that Elham "was kind of a disaster most of her life, . . . lost and adrift"; "everything to her was a struggle."  *Id.*, ¶¶ 3–4.  When Elham opened up, Murvay learned that Elham "was incomplete; she had been such a daddy's girl growing up, and then that was stripped away overnight with one business trip that he never returned from."  *Id.*, ¶ 5.  Elham was "destroyed" when, in her early 20s, a reporter sent her details about her father's treatment in detention.  *Id.*, ¶ 6.  It was only when she was able to see her father in 2015 that she "pull[ed] it together," turning into a "completely different person"—on who was "close to complete."  *Id.*, ¶¶ 8–9.

### C.      Opinion Testimony

Plaintiffs offer the declaration of Professor Shaul M. Gabbay, Ph.D., as expert testimony pursuant to Rule 702 of the Federal Rules of Evidence.[7, 8]  He opines that "[i]t is highly likely"

---

[7] Professor Gabbay has a Ph.D. in Sociology from Columbia University and is currently the Director of the Global Research Institute at the Posner Center to International Development in Denver, Colorado.  ECF No. 26-61 at 2–3.  Prior to that, he was a Senior Scholar at the Josef Korbel School of International Studies at the University of Denver where he also served as Director of a Middle East institute.  *Id.* at 3.  He has provided commentary as an international affairs expert on television news programs, and conducted research, taught classes, and presented scholarly papers on various aspects of sociology of the Muslim world and Middle East.  *Id.*  As has at least one other judge in this Circuit, the Court finds that he is sufficiently qualified by "knowledge, skill, experience, training, or education" to testify as an expert under the Federal Rules of Evidence on the treatment of detainees in Iran.  Fed. R. Evid. 702; *see Levinson v. Islamic Republic of Iran*, 443 F. Supp. 3d 158, 165 (D.D.C. 2020) (qualifying Professor Gabbay "as an expert in the current conditions in Iran, the treatment of prisoners in Iran, and the regime's use of torture").

[8] In reaching his opinions, Professor Gabbay relied on newspaper articles and reports of non-governmental organizations ("NGOs") of the type that the Court finds inadmissible below.  *See infra* note 11; *see also generally* ECF No. 26-61.  However, "under Federal Rule of Evidence 703 the expert may rely on inadmissible evidence so long as experts in the same field reasonably rely on such evidence."  *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 362 F. Supp. 2d 168, 177 (D.D.C. 2005).  In FSIA terrorism exception cases in this Circuit, courts have approved the reliance of experts on such materials.  *See, e.g., id.* ("The proper question is whether experts in . . . [the] field of foreign policy and terrorism analysis reasonably rely on newspaper articles to gather and analyze information on newsworthy events.  The court determines that they do."); *Levinson*, 443 F. Supp. 3d at 174 (approving expert testimony from Professor Gabbay that relied on "case studies and reports from well-known human rights organizations describing Iran's use of torture.").  Nevertheless, "although '[e]xpert opinions may be based on hearsay . . . they may not be a conduit for the introduction of factual assertions that are not based on personal knowledge.'"  *Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 173 (D.D.C. 2016) (alterations in original) (quoting *Estate of Parsons v.*

that Amir-Entezam suffered from torture—such as "prolonged solitary confinement, sleep deprivation, denial of access to toilet facilities, beatings, interrogations and threats[] coupled with attempts to force false confessions, and the denial of adequate medical care"—during his time in Evin Prison from 1979 to 2006. ECF No. 26-61 at 36–37. That his torture "result[ed] in numerous severe health conditions that persisted until his death." *Id.* at 37. In addition, Professor Gabbay states that "it is highly likely" that Amir-Entezam was tortured while under house arrest after he was released from prison in 2006. *Id.* That opinion appears to be based on the fact that Amir-Entezam had continuing health problems from his treatment while imprisoned—damage to his spine, kidney problems, hearing loss, and "illnesses of his eye, prostate, and pelvis"—and that Iranian officials dangled the prospect of a pardon if he "falsely confessed to the government's fabricated claims." *Id.* Finally, Professor Gabbay states that "there are sufficient facts" to establish that Amir-Entezam was a victim of hostage taking as that term is defined under the International Convention Against the Taking of Hostages, *see* International Convention Against the Taking of Hostages, art. 1, Dec. 17, 1979, 13 U.N.T.S. 205, when he was rearrested in 1999 along with his wife, reasoning that "a condition for [their] release was for [his wife] to cease her political activities."[9, 10] *Id.* at 37–38.

---

*Palestinian Auth.*, 715 F. Supp. 2d 27, 33 (D.D.C. 2010)). Therefore, the Court relates Professor Gabbay's opinions and conclusions but not the factual assertions based on hearsay evidence in his report.

[9] To add some clarity to the timeline, a press release from Amnesty International (inadmissible as hearsay, *see infra* note 11) asserts that Amir-Entezam was arrested and imprisoned in 1998 and the charges were later dropped, although he was not released. ECF No. 26-25 at 2. In July 1999, his wife was arrested and detained for approximately 20 days. *Id.*

[10] Professor Gabbay also states that Amir-Entezam was a victim of hostage taking "from the initial situation of his arbitrary arrest and detention," because it was "related to the US-Iran relationship." ECF No. 26-61 at 37–38. Wisely, given that the mere fact that arrest and detention are "related to" a relationship between two countries is not, on its own, sufficient to establish hostage taking, Plaintiffs do not press that theory. *See* ECF No. 26 at 10 ("Agents of the Iranian government were the direct cause of injuries to Mr. Amir-Entezam and Plaintiffs when they arrested Mr. Amir-Entezam to force his wife to stop advocating for Mr. Amir-Entezam and situation on Human Rights, and remain silent."). The Court therefore does not address it.

### D.    Other Evidence

Plaintiffs have offered certain "secondary materials," *Owens v. Republic of Sudan*, 864 F.3d 751, 787 (D.C. Cir. 2017) *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, __ U.S. __, 140 S. Ct. 1601 (2020), as evidence in support of their motion, including reports from the United States Department of State and reports from the United Nations.  First, a note on admissibility.  As this Court has previously found, reports from the United Nations and U.S. State Department like the ones discussed below are admissible under the Rule 803(A)(iii) of the federal Rules of Evidence.  *See Alinejad v. Islamic Republic of Iran*, No. 19-cv-3599, 2023 WL 4684929, at \*16 (D.D.C. July 6, 2023).  As explained in *Alinejad*, "To be admissible under that hearsay exception for public records, the record must be from a 'public office,' contain 'factual findings . . . from a legally authorized investigation,' and must not 'indicate a lack of trustworthiness.'"  *Id.* (alteration in original) (quoting Fed. R. Evid. 803(8)).  Both the State Department and the United Nations are public offices.   *See id.* at \*16–17 & n.21.  The reports at issue contain factual findings and appear trustworthy.  More,

> courts do not interpret the "legal duty" provision [of Rule 803(8)] to require that a statute or other legal rule explicitly impose a duty on the declarant or agency to report a particular observation. "Rather, it suffices if the nature of the responsibilities assigned to the public agency are such that the record is appropriate to the function of the agency."

30B Charles Alan Wright, *et al.*, Federal Practice and Procedure § 6884 (2023 ed.) (footnote omitted) (quoting *United States v. Lopez*, 762 F.3d 852, 862 (9th Cir. 2014)).  That somewhat relaxed view of the rule is particularly appropriate in cases like this one, because "[t]he district court has an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism."  *Owens*, 864 F.3d at 785.  The Court thus finds that each of the reports discussed in this section is admissible under Rule 803(8).

As to the contents of those reports, "[p]ursuant to the 'broad approach to admissibility' under Rule 803(8)," a court may admit not only the factual findings, but also the "conclusion[s] or opinion[s]' contained within the public record." *Id.* (second and third alterations in original) (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988)..  That is true even if those conclusions or opinions are derived from hearsay, as long as they are also based on the public office's factual investigation (and are sufficiently trustworthy).  *See English v. District of Columbia*, 651 F.3d 1, 7–8 (D.C. Cir. 2011) (approving the district court's admission of a report under Rule 803(8)(C)—now Rule 803(8)(A)(iii)—that included conclusions derived from double and triple hearsay because they were based on the writer's "own factual investigation" and noting that "the Supreme Court has held that Rule 803(8) does not 'draw some inevitably arbitrary line between the various shades of fact/opinion that invariably will be present in investigatory reports'" (quoting *Beech Aircraft Corp,* 488 U.S. at 169, 109 )).  That is not to say, however, that all the information included in them is admissible for the truth of the matters asserted.  Rule 803(8) is not "a multi-level hearsay exception beyond the reach of Rule 805"—the rule that "require[es] [an] independent hearsay exception for each embedded level of hearsay within a statement."  *Berkley Ins. Co. v. Fed. Housing Fin. Agency*, Nos. 13-cv-1053, 13-mc-1288, 2023 WL 4744155, at *16 (D.D.C. July 25, 2023).  Thus, the D.C. Circuit, among others, has made clear that hearsay statements (as opposed to conclusions or opinions formed by the entity performing the factual investigation based on hearsay) contained in a report admissible under the public records exception must themselves be covered by an exception to be admissible for the truth of the matter asserted.  *See United States v. Slatten*, 865 F.3d 767, 804 n.7 (D.C. Cir. 2017) (engaging in an analysis under Rule 805 for hearsay contained within a public record admissible under Rule 803(8)); *see also, e.g.*, *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) ("[P]lacing otherwise inadmissible

hearsay statements by third-parties into a government report does not make the statements admissible."). The following section outlines the most relevant and admissible evidence from the State Department and United Nations documents submitted by Plaintiffs.[11]

1.      State Department Reports

Plaintiffs offer five reports originating with the State Department: (1) "Country Reports on Human Rights Practices for 2004" ("2004 State Department Report"), ECF No. 26-28, which was submitted to the Senate Committee on Foreign Relations and the House Committee on International Relations; (2) a 2018 report by an initiative within the State Department known as the "Iran Action Group" titled "Outlaw Regime: A Chronicle of Iran's Destructive Activities" (the "2018 Iran Action Group Report"), ECF No. 26-37; (3) a report from the Bureau of Democracy, Human Rights, and Labor within the State Department titled, "2019 Country Reports on Human Rights Practices: Iran" (the "2019 Bureau of Democracy Report"), ECF No. 26-39; (4) a report from the Bureau of Counterterrorism within the State Department titled, "Country Reports on Terrorism 2019" (the "2019 Bureau of Counterterrorism Report"), ECF No. 26-44; and a report from

---

[11] Plaintiffs have also submitted a number of reports form NGOs, news articles, and press releases. *See, e.g.*, ECF Nos. 26-15, 26-19 through 26-25, 26-27, 26-32 through 26-35, 26-36, 26-40, 26-41, 26-55, 26-56, 26-58, 26-59. Reports from NGOs do not fall under the exception for public records, because NGOs are not considered public offices, and Plaintiffs have provided no argument that they fall under another exception. *See Alinejad*, 2023 WL 4684929, at *17 & n.22. Likewise, Plaintiffs have provided no argument that the various news articles or press releases are admissible under a hearsay exception. *See Huitra v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 123 (D.D.C. 2002) (concluding that news articles are hearsay and that "[i]t would be wholly inappropriate to permit" a FSIA plaintiff "to satisfy the requirement of 28 U.S.C. § 1608(e) by submitting an unsubstantiated newspaper article"). Indeed, Plaintiffs' memorandum on the admissibility of evidence includes no legal argument whatsoever, *see generally* ECF No. 26-1, and the Court will not create their arguments for them. *See N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work."). Therefore, although it is possible some of the materials submitted might be admissible under an exception to the hearsay rule—for example, the exception for statements in so-called "ancient documents" of Rule 803(16) or the residual exception of Rule 807, the Court has not considered those materials in rendering this decision. Other issues of admissibility will be discussed in relation to specific pieces of evidence where appropriate.

the Bureau of Counterterrorism within the State Department titled "Country Reports on Terrorism

2020" (the "2020 Bureau of Counterterrorism Report"),  ECF No. 26-45.[12]

According to the 2004 State Department Report, some prison facilities in Iran, including

Evin Prison "were notorious for the cruel and prolonged acts of torture inflicted on political pris-

oners," including

> prolonged solitary confinement with sensory deprivation, beatings, long confine-
> ment in contorted positions, kicking detainees with military boots, hanging detain-
> ees by the arms and legs, threats of execution if individuals refused to confess,
> burning with cigarettes, sleep deprivation, [ ] severe and repeated beatings with ca-
> bles or other instruments on the back and soles of the feet[, and] beatings about the
> ears, inducing partial or complete deafness, and punching in the eyes, leading to
> partial or complete blindness.

ECF No. 26-28 at 34.  It later repeats that "[p]rison conditions in the country were poor" and that

"[m]any prisoners were held in solitary confinement or denied adequate food or medical care to

force confessions."  *Id.* at 36.  The report mentions Amir-Entezam by name, asserting that, in April

2003, he was re-imprisoned after his 2002 release for medical reasons and that, as a "longtime

political dissident, [he] ha[d] spent much of the last 24 years"—that is, since approximately

1979—"in prison."[13]  *Id.* at 35, 39.

None of the remaining reports from the State Department mention Amir-Entezam, but,

rather, discuss Iran's reputation for torturing prisoners, particularly at Evin Prison.  The "2018 Iran

Action Group Report" asserts that "the Iranian regime regularly uses torture and other cruel,

---

[12] A sixth State Department report, from the Bureau of Democracy, Human Rights, and Labor, appears to merely
reproduce the section on Iran from the 2004 State Department Report.  *Compare* ECF No. 26-28 at 32–39 *with* ECF
No. 26-38 at 1–6.  A seventh, a volume of *Foreign Relations of the United States* documenting the Iran Hostage Crisis,
ECF No. 26-18, is cited once by Plaintiffs, in support of their statement that "[i]n December 1979, a group of Iranian
college students supporting the Islamic Revolution took over the U.S. Embassy in Tehran."  ECF No. 26 at 2 & n.1.

[13] The 2004 State Department Report also states that Amir-Entezam "was reportedly a frequent victim of torture in
prison resulting in numerous medical problems.  He reported having been taken on numerous occasions before a firing
squad."  ECF No. 26-28 at 35.  Rather than a finding of fact or conclusion derived from an investigation, this statement
appears to simply relate what Amir-Entezam said.  As such, it is hearsay and not admissible as evidence that he was
tortured.

inhumane, or degrading forms of punishment, particularly in Iran's notorious Evin Prison," including physical and mental torture to coerce confessions and denial of access to medical care, such that in May 2018, "the U.S. Treasury designated Evin Prison for its serious human rights abuses." ECF No. 26-37 at 38–39.  The 2019 Bureau of Democracy Report similarly asserts that the "use of physical and mental torture to coerce confessions remained prevalent, especially during pretrial detention." ECF No. 26-39 at 8.  It continues, noting that "[h]uman rights organizations frequently cited some prison facilities, including Evin Prison . . . , for their use of cruel and prolonged torture of political opponents." *Id.* at 9.  The 2019 Counterterrorism Bureau Report mentions briefly that in Iran (as well as the other nations analyzed) "significant human rights issues," such as engaging in torture, have "influenced the state of terrorist activity in the country and may have impeded effective counterterrorism policies and programs or supported causes and conditions for further violence." ECF No. 26-44 at 8.  It further finds that "Tehran has spent as much as $700 million per year to support terrorist groups, including Hizballah and Hamas." *Id.* at 4.  The 2020 Bureau of Counterterrorism Report reports similar findings. *See* ECF No. 26-45 at 10 (noting that Iran, like the other countries listed, is plagued with "significant human rights issues," including torture, arbitrary detention, and "harsh and life-threatening prison conditions"), 203 (noting that "Iran has provided hundreds of millions of dollars in support of Hizballah and trained thousands of its fighters at camps in Iran" and has supplied weapons, support, and/or training to the Assad regime in Syria and to militant groups in Bahrain and Yemen).

> 2.    U.N. Reports

Five reports from the United Nations include non-hearsay evidence regarding Iranian torture generally and Amir-Entezam's situation in particular.  Four of those reports are on "the situation of human rights in the Islamic Republic of Iran" from the Special Representative of the

Commission on Human Rights (the "Special Representative"): (1) a 1993 Report (the "1993 U.N. Special Representative Report"), ECF No. 26-53; (2) a 1996 Report (the "1996 U.N. Special Representative Report"), ECF No. 26-46; (3) a 1999 Interim Report (the "1999 Interim U.N. Special Representative Report"), ECF No. 26-49; and (4) a 2000 Report (the "2000 U.N. Special Representative Report"), ECF No. 26-48.  The fifth document is a 2000 communication from the Working Group on Arbitrary Detention to the government of Iran concerning Amir-Entezam (the "2000 U.N. Working Group Communication"), ECF No. 26-42.[14]

According to the 1993 U.N. Special Representative Report, the Special Representative in December 1991 visited Amir-Entezam in Evin Prison, who had been "convicted on charges of espionage for a foreign government and on political charges[] after a summary trial in which he was not represented by a lawyer and during which some witnesses called in his defense were arrested."  ECF No. 26-53 at 62.  The report asserts that Amir-Entezam "is without adequate medical treatment and food."[15]  *Id.*  The 1996 U.N. Special Representative Report relates that Amir-Entezam was "sentenced in 1980 to life imprisonment on charges of espionage."  ECF No. 26-46 at 10.  The Special Representative visited Iran by invitation in February 1996 and was able to meet with

---

[14] Other U.N. documents from various Special Rapporteurs between 2008 and 2021, contain little or no evidence of specific relevance to the facts of this case.  *See generally* ECF No. 26-50 (2008 Interim Report from the Special Rapporteur on torture and other cruel, inhuman, or degrading treatment or punishment, Manfred Nowak), 26-52 (2010 Report from the Special Rapporteur on torture and other cruel, inhuman, or degrading treatment or punishment, Manfred Nowak), 26-51 (2017 Report of the Special Rapporteur on torture and other cruel, inhuman, or degrading treatment or punishment, Nils Melzer), 26-30 (2020 Report of the Special Rapporteur on torture and other cruel, inhuman, or degrading treatment or punishment), 26-47 (2021 Report of the Special Rapporteur on the situation of human rights in the Islamic Republic of Iran, Javid Rehman).

[15] The 1993 U.N. Special Representative Report also states that Amir-Entezam had "reportedly lost 40 per cent of his hearing and suffers from a disease of the pelvis eye and prostate illnesses, a stomach ulcer and skin irritation" and "has reportedly no right to receive visits and spent 550 days in solitary confinement."  ECF No. 26-53 at 62.  Those statements are not factual findings by the U.N. and do not appear to be conclusions based on its investigation, but merely information "reported[]" by unidentified individuals.  As such, they are hearsay.  The report also includes a letter from Amir-Entezam in which he provides examples of torture he had witnessed during his time in prison.  *See id.* at 67–68.  That, too, is hearsay.

Amir-Entezam "[o]utside Evin prison."[16]  *Id.* at 2, 10.  The 1999 Interim U.N. Special Representative Report includes a finding that "torture and similar treatment or punishment continue to exist [in Iran] and the prison system is facing unacceptable physical conditions."  ECF No. 26-49 at 3. As to Amir-Entezam, it notes that both he and his wife had been detained in 1999 "without apparent cause."  *Id.* at 18.  The 2000 U.N. Special Representative Report includes a similar statement. *See* ECF No. 26-48 at 25.  The 2000 U.N. Working Group Communication reports that Amir-Entezam was arrested in September 1998 on charges of defamation, apparently based on his criticisms of prison conditions in an "interview granted to Voice of America when Amir-Entezam was under house arrest."  ECF No. 26-42 at 2.  Amir-Entezam was temporarily released in October 1999 for medical treatment and returned to Evin Prison in December 1999 after granting an interview to an Iranian newspaper; he was again released for medical treatment in March 2000, "but was returned to prison nine days later, allegedly before he had recovered his health."  *Id.*  As of the time of the communication, he remained in prison.  *Id.*

## III.   LEGAL STANDARD

The Federal Rules of Civil Procedure establish a two-step process for entry of default judgment.  Fed. R. Civ. P. 55(a)–(b); *see also United States v. Twenty-Four Cryptocurrency Accounts*, 473 F. Supp. 3d 1, 4 (D.D.C. 2020).  First, a plaintiff must request "that the Clerk of Court enter default against a party who has failed to plead or otherwise defend."  *Cryptocurrency*, 473 F. Supp. 3d at 4 (citing Fed. R. Civ. P. 55(a)).  Second, the plaintiff must then apply for a default judgment against the absent defendant.  *Id.* (citing Fed. R. Civ. P. 55(b)).

A default judgment is available only when "the adversary process has been halted because of an essentially unresponsive party."  *Doe v. Syrian Arab Republic*, No. 18-cv-66, 2020 WL

---

[16] As above, information that the Special Representative states Amir-Entezam told him is hearsay.

5422844, at *5 (D.D.C. Sept. 10, 2020) (internal citations omitted).  "[D]efault judgment is war-
ranted if a defendant is a 'totally unresponsive' party and its default is plainly willful, as reflected
by its failure to respond, 'either to the summons and complaint, the entry of default, or the motion
for default judgment.'"  *Id.* (internal citations omitted).  However, a notation of default by the
Clerk of the Court against an unresponsive defendant does not automatically entitle a plaintiff to a
default judgment.  Rather, it is appropriate only if the complaint's well-pleaded allegations, ac-
cepted as true, state an adequate claim for relief.  *See Marmaras v. Marafatsos*, No. 18-1236, 2019
WL 3414363, at *2 (D.D.C. July 29, 2019); *Jackson v. Corr. Corp. of Am.*, 564 F. Supp. 2d 22,
26–27 (D.D.C. 2008).  In other words, entry of default "'establishes the defaulting party's liability
for the well-pleaded allegations of the complaint,' but not for allegations that are not sufficiently
pleaded."  *United States v. $6,999,925.00 of Funds Associated with Velmur Mgmt. Pte Ltd.*, 368
F. Supp. 3d 10, 17 (D.D.C. 2019) (quoting *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp.
2d 64, 67 (D.D.C. 2011)).  In that way, "'[c]onceptually, . . . a motion for default judgment is like
a reverse motion to dismiss for failure to state a claim.'"  *Doe*, 2020 WL 5422844, at *5 (alteration
in original) (quoting *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015)).

Before a default judgment can be entered against a foreign sovereign, the FSIA requires a
plaintiff to establish his or her "claim or right to relief by evidence satisfactory to the court."  28
U.S.C. § 1608(e)).  That evidence must also be admissible.  *Owens*, 864 F.3d at 786–87.  A court
must "scrutinize the plaintiff's allegations and 'may not unquestioningly accept a complaint's un-
supported allegations as true.'"  *Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141, 152 (D.D.C.
2019) (quoting *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012)).  How-
ever, "[c]ourts take uncontroverted factual allegations that are supported by admissible evidence
as true."  *Blank v. Islamic Republic of Iran*, No. 19-cv-3645, 2021 WL 3021450, at *6 (D.D.C.

July 17, 2021) (internal citations omitted).  An evidentiary hearing is not required; rather, a "plain-

tiff may establish proof by affidavit."  *Compagnie Sahelienne d'Entreprise v. Republic of Guinea*,

No. 20-cv-1536, 2021 WL 2417105, at *2 (D.D.C. June 14, 2021); *see also Mwani v. bin Laden*,

417 F.3d 1, 7 (D.C. Cir. 2005) ("In the absence of an evidentiary hearing, although the plaintiffs

retain 'the burden of proving personal jurisdiction, [they] can satisfy that burden with a prima facie

showing.' . . .  [T]hey may rest their argument on their pleadings, bolstered by such affidavits and

other written materials as they can otherwise obtain." (first alteration in original) (quoting *Edmond

v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991))).

Additionally, "the procedural posture of a default does not relieve a federal court of its

'affirmative obligation' to determine whether it has subject-matter jurisdiction over the action."

*Egypt Dep't of Def. v. Alboghdady*, No. 21-cv-1144, 2021 WL 3737682, at *3 (D.D.C. Aug. 24,

2021) (quoting *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996)).

The party seeking the default judgment is required to demonstrate that "the court has both subject-

matter jurisdiction over the action and personal jurisdiction over the absent defendant."  *Rad-

manesh v. Gov't of Islamic Republic of Iran*, No. 17-cv-1708, 2019 WL 1787615 (D.D.C. Apr. 24,

2019), *aff'd sub nom. Radmanesh v. Islamic Republic of Iran*, 6 F.4th 1338 (D.C. Cir. 2021).  And

"'[e]ven if there are sufficient contacts for a court to assert personal jurisdiction over a defendant,

it lacks power to do so unless the procedural requirements of effective service of process are sat-

isfied.'"  *Doe*, 2020 WL 5422844, at *6 (quoting *Gorman v. Ameritrade Holding Corp.*, 293 F.3d

506, 514 (D.C. Cir. 2002)).

If a court deems default judgment appropriate, it must independently determine the appro-

priate remedies.  *See Pescatore v. Palmera Pineda*, 345 F. Supp. 3d 68, 70 (D.D.C. 2018)

("'[U]nless the amount of damages is certain, the court is required to make an independent

21

determination of the sum to be awarded.'" (quoting *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001))). Specifically, "unlike a plaintiff's well-pleaded allegations as to liability, a court does not take factual allegations related to damages as true." *Doe*, 2020 WL 5422844, at *6. Rather, "a court makes its damages determination 'in light of the facts and the circumstances of the case at hand.'" *Id.* (quoting *SEC v. Whittemore*, 691 F. Supp. 2d 198, 209 (D.D.C. 2010)). "While the court may conduct a hearing to fix the amount of damages, it is not required to do so, 'as long as it ensure[s] that there [is] a basis for the damages specified in the default judgement.'" *Id.* (quoting *SEC v. China Holdings, Inc.*, No. 09-cv-2045, 2010 WL 11603046, at *2 (D.D.C. Sept. 24, 2010) (alterations in original)).

## IV.   DISCUSSION

Plaintiffs filed their amended complaint on September 23, 2019. ECF No. 5. On January 14, 2020, Plaintiffs requested the Clerk of the Court's assistance to effect service on Defendants by mail pursuant to 28 U.S.C. § 1608(a)(3). When Defendants failed to respond within thirty days, Plaintiffs, on March 9, 2020, requested the Clerk's assistance in effecting service through diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4). Service was executed on Iran by that method on August 19, 2020. Thereafter, Defendants had until October 18, 2020, to file an answer. When Defendants failed to respond or file an answer by the deadline, Plaintiffs filed an affidavit for entry of default against Iran on January 15, 2021.[17] ECF No. 15. The Clerk of the Court entered default

---

[17] Plaintiffs did not seek entry of default against IRGC. *See* ECF No. 15 at 1 (requesting "that the Clerk of Court enter a default by Defendant the Islamic Republic of Iran"); ECF No. 15-1 (referring in the affidavit in support of the request for entry of default only to a single "Defendant[,] the Islamic Republic of Iran"). Further, their motion for default judgment "request[s] that this Court enter default judgment against Iran," with no mention of IRGC. ECF No. 26 at 1. However, cases have held that IRGC is "not a 'separate legal person,' but is a governmental entity," *Ben-Rafael v. Islamic Republic of Iran*, 718 F. Supp. 2d 25, 33 (D.D.C. 2010), and thus is "the foreign state itself," *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 59 (D.D.C. 2019) (quoting *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003)) (internal quotation marks omitted). As such, there was no need for a separate entry of default against IRGC, because it is not an entity distinct from the Islamic Republic of Iran. *See Holladay*, 406 F. Supp. 3d at 59 (stating that IRGC "must in all cases be considered as the 'foreign state' itself" (quoting *Transaero,*

on January 17, 2021.  ECF No. 16.  On October 31, 2022, Plaintiffs filed the instant motion for default judgment as to liability and for an award of economic, non-economic, and punitive damages.  ECF No. 26.

### A.    Personal Jurisdiction

The undersigned first examines if effective service was made pursuant to 28 U.S.C. § 1330(b), which governs personal jurisdiction over foreign states.  That section provides that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of this title." *Id.* Service is made on a foreign state under section 1608 in one of four ways:

(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

(2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

(3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

---

*Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994))).  Hereinafter, any references to Iran as a defendant should be read to include IRGC.

28 U.S.C. § 1608(a).  The methods of service outlined in section 1608(a) are listed in order of preference; plaintiffs must attempt the first method before proceeding to the next.  *Angellino v. Royal Fam. Al-Saud*, 688 F.3d 771, 773 (D.C. Cir. 2012).  "[S]trict adherence to the terms of 1608(a) is required" and "neither substantial compliance, nor actual notice, suffice[s] under section 1608(a)(3) because Congress had mandated 'service of the Ministry of Foreign Affairs, the department most likely to understand American procedure.'"  *Barot v. Embassy of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015) (quoting *Transaero*, 30 F.3d at 154).  As many litigants do in FSIA cases against Iran, Plaintiff successfully served Iran through diplomatic channels pursuant to Section 1608(a)(4).

Iran does not have a special arrangement for service with Plaintiff, nor has it "entered into any international convention governing service" of judicial documents, so sections 1608(a)(1) and 1608(a)(2) do not provide avenues for service.  *See Blank*, 2021 WL 3021450, at *8 (finding that the methods of service set forth in Section 1608(a)(1) and (2) were unavailable to plaintiffs in FSIA action against Iran).  So, on January 14, 2020, Plaintiffs filed an affidavit requesting that the Clerk of the Court mail a copy of the summons and complaint to the head of the Ministry of Foreign Affairs to attempt service pursuant through section 1608(a)(3).  ECF No. 7-1 at 2.  In support of their request for service under section 1608(a)(3), Plaintiffs explained that service could not be made pursuant to section 1608(a)(1) because no special arrangement for service exists between the United States and Iran.  ECF No. 7-1 at 2.  As to service under section 1608(a)(2), Plaintiffs explained that the United States and Iran have no diplomatic relations, and courts have recognized that Iran is not a party to an international convention on service of judicial documents, so service under 1608(a)(2) is impossible.  *See Ben-Rafael*, 540 F. Supp. 2d at 52; *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 70 (D.D.C. 2010).  On January 24, 2020, the Clerk of the Court mailed

"one copy of the summons, complaint, and notice of suit, together with a translation of each into the official language of [Iran], by registered mail . . . to the head of the ministry of foreign affairs, pursuant to 28 U.S.C.  1608(a)(3)."  On February 25, 2020, Plaintiffs sent a letter to the Clerk stating that no response was received from Defendants.  ECF No. 11-1 at 1.  Thus, service under 1608(a)(3) was unsuccessful and nothing more was required under that section.  *See Doe*, 2020 WL 5422844, at *12 (concluding "[n]othing more was required for [the plaintiffs] to satisfy their obligations to attempt service under section 1608(a)(3)" after the Clerk of the Court mailed the documents and the Syrian Foreign Ministry refused delivery); *Ben-Rafael*, 540 F. Supp. 2d at 52 (holding that service under 1608(a)(3) was not possible and plaintiff's obligations were satisfied when delivery was attempted and recipient refused delivery).

Following the attempt at service under section 1608(a)(3), on March 9, 2020, Plaintiffs requested that the Clerk of the Court mail a copy of the summons and complaint to the U.S. Department of State as an "alternate means of service" pursuant to section 1608(a)(4).  ECF No. 11 at 1.  That provision requires service by mail from the Clerk of Court to the Secretary of State, who must then transmit the required material through diplomatic channels to the foreign state.  28 U.S.C. §1608(a)(4).  Service was executed on Iran under cover of diplomatic note by the U.S. Interests Section of the Embassy of Switzerland in Tehran on August 19, 2020.  ECF No. 26-16 at 6.  The diplomatic note was "refused" the same day by the Iranian Ministry of Foreign Affairs. *Id.*  Accordingly, service on Iran was completed under section 1608(a)(4) and the Court therefore has personal jurisdiction over Iran.  *See Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 88 (D.D.C. 2018) (holding that Iran's refusal of diplomatic note served pursuant to section 1608(a)(4) was sufficient for personal jurisdiction); *Doe*, 2020 WL 5422844, at *12 (concluding that court had personal jurisdiction over Syria after "[s]ervice was executed on Syria . . . through a diplomatic

note delivered by the Foreign Interests section of the Embassy of the Czech Republic"); *Ben-Rafael*, 540 F. Supp. 2d at 52–53 (concluding that court had personal jurisdiction over Iran after "the Swiss foreign ministry served the documents on the Iranian Ministry of Foreign Affairs" and they were returned "to the Swiss foreign ministry without comment").

### B.      Subject-Matter Jurisdiction

Having concluded that the Court has personal jurisdiction over Iran, the undersigned turns to the Court's subject-matter jurisdiction over Plaintiffs' claims.  Section 1330(a) of Title 28 of the United States Code grants district courts original subject-matter jurisdiction "without regard to the amount in controversy" over (1) nonjury civil actions, (2) as to any claim for relief *in personam*, (3) against a foreign state, (4) provided that the foreign state is not entitled to immunity under sections 1605 to 1607 of the FSIA.  28 U.S.C. § 1330(a); *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017); *Reed*, 845 F. Supp. 2d at 210.  A plaintiff's "burden of production to establish the court's jurisdiction" is "rather modest."  *Owens*, 864 F.3d at 784.

The first three factors are easily met here:  Plaintiffs filed a nonjury civil action, seeking *in personam* relief, against a foreign sovereign, Iran.  *See generally* ECF Nos. 5 & 26.  Thus, the Court, has subject matter jurisdiction over the present "nonjury civil action" against Iran "if, and only if, the conditions for the waiver of immunity under section 1605 are satisfied."  *Fritz*, 320 F. Supp. 3d. at 77.  Foreign governments are generally immune from lawsuits unless an FSIA exception applies.  *See* 28 U.S.C. § 1604; *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C. Cir. 2015).  Plaintiffs invoke jurisdiction under Section 1605A(a)(1) of the FSIA, which provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage

26

taking, or the provision of material support or resources for such an act . . ."  28 U.S.C. § 1605A(a)(1).  Plaintiffs must prove four elements to establish subject matter jurisdiction under this exception:  (1) "the foreign country was designated a 'state sponsor of terrorism at the time of the act,'" *Mohammadi*, 782 F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(2)(A)(i)(I)); (2) "the 'claimant or the victim was' a national of the United States at that time," *id.* (quoting 28 U.S.C. § 1605A(a)(2)(A)(ii)); (3) "the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim," 28 U.S.C. §1605A(a)(2)(iii); and (4) the plaintiff seeks monetary damages "for personal injury or death caused by 'torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act,' if 'engaged in by an official, employee, or agent' of a foreign country," *Mohammadi*, 782 F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(1)).

Plaintiffs must prove these jurisdictional facts by admissible evidence, although direct, firsthand evidence—which is often unavailable in these cases—is not required.  *Owens*, 864 F.3d at 785–87.  Rather, a plaintiff may rely exclusively on admissible "secondary materials" and/or expert testimony to establish such facts.  *See id.* at 787; *see also Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1049 (D.C. Cir. 2014) ("[P]laintiffs like the Kims will find it difficult to prove what happened behind the walls of a North Korean labor camp because the government has made all but certain that that evidence does not exist. But 'common experience tells us' that where a plaintiff has produced compelling, admissible evidence that the regime abducted the victim and that it routinely tortures and kills the people it abducts, the courts can assume that the defendant probably tortured and killed the victim.  Given Congress's purpose—holding state sponsors of terrorism responsible for their crimes—such evidence is sufficient to 'satisf[y] the court.'" (second alteration in original) (quoting 28 U.S.C. § 1608(e))).  More, "[t]he district

27

court . . . has an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism." *Maalouf v. Islamic Republic of Iran*, 514 F. Supp. 3d 280, 285 (D.D.C. 2021) (ellipses in original) (quoting *Owens*, 864 F.3d at 785–86)). Thus, for example, courts may "rely on evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced." *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 50 (D.D.C. 2012) (ellipses in original) (quoting *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010)); *see also Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009) (relying on the "findings of other judges in this jurisdiction" for the purpose of determining jurisdictional facts). Nonetheless, the D.C. Circuit has emphasized that, "[i]n order to issue a default judgment" in a case under the FSIA's terrorism exception, "a court must base its findings of fact and conclusions of law upon evidence admissible under the Federal Rules of Civil Procedure."[18] *Owens*, 864 F.3d at 786.

Having established the evidentiary standard, the Court addresses each of the four jurisdictional requirements, although in a different order than they are listed above.

### 1.    State Sponsor of Terrorism

With respect to the first element, the United States designated Iran as a state sponsor of terrorism in 1984. *See* Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2836-02 (Jan. 23, 1984) (statement of Secretary of State George P. Shultz); *see also Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 59 (D.D.C. 2021) (noting that "the U.S. State Department designated Iran as a State Sponsor of Terrorism in 1984").

---

[18] The *Owens* Court noted that a district court may rely on certain evidence "that might not be admissible in a trial" to establish the relevant facts in "a FSIA case against a defaulting state sponsor of terrorism." 864 F.3d at 785. But that loosening of the standard of evidence that would apply at a trial does not undermine the rule that a court must nevertheless consider only admissible evidence. Rather, it allows for a judge to rely, for example, on evidence that might not be allowed at a trial, such as affidavits and expert testimony with "weak" factual bases. *Id.* That is, the FSIA "does not require a court to step into the shoes of a defaulting party and pursue every possible evidentiary challenge"; but a court cannot rely "on evidence that is both clearly inadmissible and essential to the outcome." *Id.* at 785–86.

Although Amir-Entezam's initial detention in 1979, occurred five years before the State Department's terrorism designation, 34 out of the 39 years of his detention occurred while Iran was designated as a sponsor of terrorism.  Because this prong of the inquiry under the terrorism exception requires only that "the foreign country was designated a 'state sponsor of terrorism at the time [of] the act,'" *Mohammadi*, 782 F.3d at 14 (alteration in original) (quoting 28 U.S.C. § 1605A(a)(2)), it is met as long as Plaintiffs establish that the torture or hostage-taking they allege took place after 1984.  As discussed below in Section IV.B.4.b, Plaintiffs have offered sufficient evidence to show that Amir-Entezam was likely tortured while he was detained between 1979 and 2006.

2.      Reasonable Opportunity to Arbitrate

In order to sue under FSIA's terrorism exception, a plaintiff must also have provided the foreign state a "reasonable opportunity" to arbitrate the claim.  28 U.S.C. § 1605A(a)(2)(A)(iii); *see also Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 45 (D.D.C. 2018) ("[T]he FSIA 'does not require any particular form of offer to arbitrate, simply the extension of a reasonable opportunity.'" (quoting *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234 (D.C. Cir. 2003)) ("*Simpson I*")).  Plaintiffs have done so in this case.  On September 25, 2020—approximately one month before Iran's answer was due and more than three months before Plaintiffs requested entry of default—they transmitted their offer to arbitrate to Iran through Certified U.S. Mail to the Interests Section of the Islamic Republic of Iran in Washington D.C. and to the Ambassador and Permanent Representative of the Islamic Republic of Iran to the United Nations in New York.  ECF No. 26-17.  Evidently, Iran did not respond to the offer to arbitrate.  Section 1605A does not require more than that.  *See Asemani v. Islamic Republic of Iran,* 266 F. Supp. 2d 24, 25 (D.D.C. 2003) (finding that plaintiff "offered the foreign state a reasonable opportunity to arbitrate his claim" when he sent an arbitration offer "by certified mail to

the Interests Section of the Islamic Republic of Iran"), *abrogated on other grounds by Lin v. United States*, 561 F.3d 503 (D.C. Cir. 2009).

### 3.    Plaintiffs' Citizenship

Plaintiffs have submitted evidence establishing that they became nationals of the United States during the period that their father was detained by Iran.  According to her declaration, Elham became a U.S. citizen on December 16, 1993.  *See* ECF No. 26-5, ¶ 13; *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 326–27 (D.D.C. 2014) (accepting "[u]ncontroverted affidavit evidence" that the plaintiffs were U.S. citizens).  Ardeshir and Anoush have submitted their Certificates of Naturalization showing that they became citizens on February 23, 1996.  *See* ECF Nos. 26-11, 26-12; *Alinejad*, 2023 WL 4684929, at *12 (relying on a certificate of naturalization to determine that the plaintiff was a U.S. national); *Diba v. Islamic Republic of Iran*, No. 20-cv-240, 2022 WL 971086, at *1 (D.D.C. Mar. 31, 2022) (same).  As such, for the Court to have jurisdiction over Elham's claims, Plaintiffs must show that Amir-Entezam was held as a hostage or tortured on or after December 16, 1993; for the Court to have jurisdiction over the claims of Ardeshir and Anoush, Plaintiffs must show that Amir-Entezam was held as a hostage[19] or tortured on or after February 23, 1996.[20]  *See Mohammadi*, 782 F.3d at 332 (noting that when jurisdiction is premised on the nationality of the plaintiffs (rather than of the victim), they must have been nationals of the United States at the time that the victim suffered the relevant conduct).

---

[19] "'Hostage-taking' is something of a term of art under the FSIA and can encompass not only initial seizure of an individual, but also the continuing detention of an individual."  *Alinejad*, 2023 WL 4684929, at *12 n.13; *see also* 28 U.S.C. § 1605A(h)(2).

[20] As noted below in Section IV.C, that date also effects the evidence that the Court may consider in determining whether Iran is liable to Plaintiffs for IIED and in determining their damages.

4.      Hostage-Taking and Torture

The fourth and final requirement for establishing jurisdiction under the FSIA's terrorism exception is "the foreign state's commission of at least one" of the following "terrorist act[s]": "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 135 (D.D.C. 2021); 28 U.S.C. § 1605A(a)(1).  Plaintiffs contend that sovereign immunity should be waived because Amir-Entezam was tortured and taken hostage by Iran.  *See* ECF No. 26 at 10–23.  For the following reasons, the Court finds that Plaintiffs have provided sufficient evidence to establish that Amir-Entezam was tortured, but not that he was taken hostage.

a.      *Hostage Taking*

The FSIA incorporates the definition of "hostage-taking" set forth in the International Convention Against the Taking of Hostages, which provides:

> Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the 'hostage') in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offence of . . . 'hostage-taking' . . . .

28 U.S.C. § 1605A(h)(2); International Convention Against the Taking of Hostages art. 1, Dec. 17, 1979, 1316 U.N.T.S. 21931.  So defined, hostage-taking under the FSIA occurs when (1) there is an "abduction or detention" and (2) the goal of the abduction or detention is "accomplishing 'the sort of third-party compulsion described in the [C]onvention.'"  *Sotloff*, 525 F. Supp. 3d at 135 (quoting *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 359 (D.C. Cir. 2006) ("*Simpson III*")).  All that is necessary to satisfy the first element is a "physical capture and confinement."  *Mohammadi*, 782 F.3d at 16.  The second element does not require a plaintiff "to show that the hostage taker 'had communicated its intended purpose'" in holding the hostage(s)

31

"'to the outside world.'"  *Levinson v. Islamic Republic of Iran*, 443 F. Supp. 3d 158, 168 (D.D.C. 2020) (quoting *Simpson III*, 470 F.3d at 360).  So, FSIA plaintiffs need not show that an "explicit demand for the hostages' release" was issued.  *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 362 F. Supp. 2d 168, 178 (D.D.C. 2005) ("*Simpson II*"), *aff'd and remanded on other grounds*, 470 F.3d 356 (D.C. Cir. 2006).  Rather, all they need do is "point[ ] to [a] nexus between what happened to [the hostage] in [Iran] and any concrete concession that [Iran] may have hoped to extract from the outside world."  *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 94 (D.C. Cir. 2002).  In other words, plaintiffs must show the existence of "some '*quid pro quo*' arrangement whereby the hostage would be released 'upon performance or non-performance of any action by that third party.'"  *Simpson III,* 470 F.3d at 359 (quoting *Price,* 294 F.3d at 94); *see also Abedini v. Gov't of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 130 (D.D.C. 2019) ("Simply stated, for [the detainee's] confinement to be "hostage taking," [d]efendants must have made his release conditional—explicitly or implicitly—on the actions or inactions of someone other than himself.").

More, the hostage-taker's goal need not be financial.  Many courts have recognized that gaining "political leverage" over a third party can be the purpose of the detention.  *See Warmbier*, 356 F. Supp. 3d at 50 (finding "that North Korea detained [the hostage] and persisted in detaining him for political leverage with the United States"); *see also Saberi v. Gov't of Islamic Republic of Iran*, 541 F. Supp. 3d 67, 79 (D.D.C. 2021) (concluding that hostage-taking occurred where "Iran unlawfully detained [the hostage] and repeatedly threatened to kill or extend her detention to increase its leverage in negotiations with the United States"); *Sotloff*, 525 F. Supp. 3d at 136 (finding that 'threat[s] to kill, injure, or continue to detain' [the hostages] 'to compel' the United States to make concessions and refrain from military action" constituted hostage-taking); *Frost v. Islamic*

*Republic of Iran*, 383 F. Supp. 3d 33, 42 (D.D.C. 2019) (finding that Iranian-backed militia abducted Americans "to further Iran's objectives, and increase its political leverage"); *Massie v. Gov't of Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 67 (D.D.C. 2008) (finding that North Korea took American soldiers hostage to "extract a public apology" from the United States). But whether the compulsion is political or financial in nature, some "exchange" must be contemplated. Thus, a hostage-taking does not occur where the detention is for purely retributive purposes. *See Simpson II*, 362 F. Supp. 2d at 179 (rejecting the theory that "hostage taking" occurred under the FSIA because "pursuit of retributive justice entails no form of exchange, nominal or substantive, between [the foreign sovereign] and a third party").

Finally, courts may "reasonably draw inferences regarding [the foreign sovereign's] state of mind and its intended purposes for detaining [the hostages] based on the plaintiffs' substantiated theories about [the foreign sovereign's] intended purposes". *Simpson III*, 470 F.3d at 362; *see also Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38, 46 (D.D.C. 2000) (finding that plaintiffs "have alleged sufficient facts to allow a reasonable inference that [the detainees] were subjected to 'hostage taking'").

The Court has no trouble finding that Amir-Entezam was detained during the period after Plaintiffs each became U.S. nationals—that is, December 1993 for Elham and February 1996 for Ardeshir and Anoush. Admissible evidence establishes that Amir-Entezam was imprisoned for the vast majority of the time between 1979 and 2006. Professor Gabbay so testified in his expert declaration. ECF No. 26-61 at 37. According to the 1993 U.N. Special Representative Report, the Special Representative visited Amir-Entezam in Evin Prison in December 1991. ECF No. 26-53 at 62. The 1996 U.N. Special Representative Report relates that Amir-Entezam was "sentenced in 1980 to life imprisonment on charges of espionage," although it further indicates that he was

not detained in prison in February 1996.  ECF No. 26-46 at 10.  The 1999 Interim U.N. Special Representative Report notes that both Amir-Entezam and his wife had been detained in 1999.  ECF No. 26-49 at 18. That evidence is sufficient to support the finding above.  The Court need not address the time between 2006 and Amir-Entezam's death in 2018 to find that this element is met.

Plaintiffs are less successful showing "some '*quid pro quo*' arrangement whereby [Amir-Entezam] would be released 'upon performance or non-performance of any action by [a] third party.'"  *Simpson III,* 470 F.3d at 359 (quoting *Price,* 294 F.3d at 94).  They contend that this element "is satisfied by how the Iranian authorities continued to detain [] Amir-Entezam in Iran to compel dissidents and his 'equally outspoken and politically uncompromising wife,' Elahe Amir-Entezam, to refrain from acting out against Iran as an implicit condition for his release."  ECF No. 26 at 12 & n.48 (quoting ECF No. 26-40 at 7 (Roya Hakakian, *Abbas Amir-Entezam: Iranian Politician who went from Deputy Prime Minister to Longest-Suffering Political Prisoner*, The Independent (July 19, 2013, 12:49 p.m.)).  They explain that, with "Amir-Entezam's detention in 1998 and baseless arrest of his wife in 1999," Iran "attempt[ed] to compel Elahe to halt her advocacy as an implicit condition for his release" and that "Amir-Entezam['s] health situation and the risk for his medical condition has been used to compel his wife . . . to be silent and stop advocation against the regime for its human rights violations and treatment of [] Amir-Entezam."  *Id.* at 12–13.

The sole piece of admissible evidence in support of this theory is Professor Gabbay's assertion that "in 1999, when [] Amir-Entezam and his wife . . . were arrested by the Islamic Republic for no apparent cause, a condition for [] Amir-Emtezam's and his wife's release was for her to cease her political activities."  ECF No. 26-61 at 38 & n.58.  However, Professor Gabbay's

conclusion is unsupported by the materials he relies on.[21]  The 1999 Interim U.N. Special Repre-

sentative Report (which Professor Gabbay misdates as from 2020, *see* ECF No. 26-61 at 38 n.58)

merely states that Amir-Entezam and his wife were detained "without apparent cause" and that the

Special Representative had been told that Amir-Entezam's wife had been released.  ECF No. 26-

49 at 18.  An Amnesty International press release from 2001 asserts that "[o]n Sunday July 18,

1999, [Amir-Entezam's] wife, Elahe Mizani was arrested and spent 20 days in solitary confine-

ment.  She was released following interrogation and on condition that she would 'remain silent.'"

ECF No. 26-25 at 2.  Nothing indicates that Amir-Entezam's *own* release was conditioned on his

wife's silence.  And, indeed, Plaintiffs' assertion that Iran used Amir-Entezam's "health situation

and the risk for his medical condition" to compel her "to be silent and stop advocating against the

regime for its human rights violations and treatment" of Amir-Entezam, ECF No. 26 at 12–13,

indicates that Iran was using Amir-Entezam's *continued detention* rather than the prospect of his

release to attempt to enforce her silence.  This case is thus distinguishable from *Kar v. Islamic*

*Republic of Iran*, where Judge Bates found that a sufficient nexus was shown between the detention

of Siamak Pourzand—the husband of Mehrangiz Kar, an Iranian human rights attorney and activ-

ist—and Iran's attempts to pressure Kar to stop publicly criticizing the Iranian regime based on

evidence that, while detained, Pourzand had repeatedly called Kar and their family to "beg[] them

to stop their continued advocacy and press efforts on his behalf" and an expert opinion credited by

the court that the "plaintiffs' claim that [Pourzand] was detained in an effort by government

---

[21] Although, generally, "judicial inquiry under Rule 703 is limited to the *basis* of the expert opinion" and where "the underlying basis or methods of an expert's opinion are of a type reasonably relied upon by the experts in the field, the court must allow the opinion to be assessed by the factfinder," *Mendes-Silva v. United States*, 980 F.2d 1482, 1485 (D.C. Cir. 1993), when there are factual disputes about subject matter jurisdiction, "the district court serves as the fact-finder and may weigh the evidence," *Scarfo v. Ginsberg*, 175 F.3d 957, 961 (11th Cir. 1999).  Further, the FSIA requires the party moving for a default judgment against a foreign state to "establish his claim or right to relief by *evidence satisfactory to the court*." 28 U.S.C. § 1608(e) (emphasis added)); *see also Owens*, 864 F.3d at 790 (approv-ing the district court's inquiry into the factual basis for an expert's opinion in an FSIA terrorism exception case).  Thus, here the Court acts as fact-finder and must assess the persuasiveness of the expert opinion.

officials to undermine and coerce his wife is consistent with other instances of blackmail against family members of political dissidents in the Islamic Republic."  Nos. 19-cv-2070, 19-cv-2602, 2022 WL 4598671, at *9 (D.D.C. Sept. 30, 2022).  There is no similar evidence here.

The Court thus finds that there is insufficient evidence to establish that Amir-Entezam was taken as a hostage to compel the silence of his wife.

> b.     *Torture*

The FSIA incorporates the definition of "torture" from the Torture Victim Protection Act ("TVPA").  28 U.S.C. § 1605A(h)(7).  Under that statute,

> (1) the term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and
>
> (2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—
>
> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
>
> (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
>
> (C) the threat of imminent death; or
>
> (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3, 106 Stat. 73, 73 (1992), *codified at* 28 U.S.C. § 1350 (note).  However, in cases such as this one, "there is often little direct evidence

about precisely how [the abductee] was treated by his abductors." *Levinson v. Islamic Republic of Iran*, 443 F. Supp. 3d 158, 173 (D.D.C. 2020) [hereinafter *Levinson I*].  As the D.C. Circuit has explained:

> [F]irsthand evidence of terrorist activities is difficult, if not impossible, to obtain. Victims of terrorist attacks, if not dead, are often incapacitated and unable to testify about their experiences. Perpetrators of terrorism typically lie beyond the reach of the courts and go to great lengths to avoid detection. Eyewitnesses in a state that sponsors terrorism are similarly difficult to locate and may be unwilling to testify for fear of retaliation. The sovereigns themselves often fail to appear and to participate in discovery . . . .

*Owens*, 864 F.3d at 787.  So, in this Circuit, where a foreign sovereign has failed to appear in a suit proceeding under the terrorism exception, "the Court may infer that a victim was tortured from 'compelling, admissible evidence' that the regime at issue routinely tortures its prisoners." *Levinson I*, 443 F. Supp. 3d at 173 (quoting *Han Kim*, 774 F.3d at 1049).  Such evidence includes "secondary materials and the opinions of experts."  *Owens*, 864 F.3d at 787 ("With a dearth of firsthand evidence, reliance upon secondary materials and the opinions of experts is often critical in order to establish the factual basis of a claim under the FSIA terrorism exception."); *see also id.* at 789 (explaining that there is no "categorical requirement of direct evidence in FSIA cases"). Indeed, "cases in this Circuit and in others have repeatedly sustained jurisdiction or liability or both under the terrorism exception to the FSIA and in other terrorism cases based solely upon" such secondary evidence, including expert testimony.  *Id.* at 788 (citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1131–32 (D.C. Cir. 2004), and *Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 705 (7th Cir. 2008)); *see also Han Kim*, 774 F.3d at 1049 (affirming the finding that torture occurred where the only supporting evidence was expert testimony that the North Korean government routinely tortured prisoners in the type of labor camps to which the hostage was confined).

More, because "the FSIA does not require this Court to relitigate issues that have already been settled," courts can and do take judicial notice "'of related proceedings and records in cases before the same court'" and of the "findings of other judges in this jurisdiction" when determining FSIA jurisdictional issues. *See Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009) (quoting *Estate of Heiser v. Islamic Republic of Iran,* 466 F. Supp. 2d 229, 263 (D.D.C. 2006) ("*Heiser I*")).  Thus, *Brewer* concluded that Iran provided material support for extrajudicial killings conducted by Lebanese militant group Hezbollah based in part on the conclusions reached by other courts concerning Iran's connections to Hezbollah.  *Id.*; *see also Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 387 (D.D.C. 2015) (taking judicial notice of findings in other, unrelated cases before different judges concerning Iran's "liability for state sponsorship of terrorism"); *Bakhtiar v. Islamic Republic of Iran*, 571 F. Supp. 2d 27, 29 (D.D.C. 2008) (taking "judicial notice of the findings of fact and conclusions of law in" a separate but related case before a different judge), *aff'd*, 668 F.3d 773 (D.C. Cir. 2012).  Taking judicial notice in this manner is consistent with the "unusual degree of discretion" district courts have "over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism."  *Owens*, 864 F.3d at 785; *see also Han Kim II*, 774 F.3d at 1048 (noting that "the Supreme Court has 'recognize[d] very realistically' that courts have the authority—indeed, we think, the obligation—to 'adjust [evidentiary requirements] to . . . differing situations'" (alterations in original) (quoting *Bundy v. Jackson,* 641 F.2d 934, 951 (D.C. Cir. 1981) (citing *McDonnell Douglas Corporation v. Green,* 411 U.S. 792 (1973))).  Further, courts may take judicial notice *sua sponte*.  *See T.V.T. Corp. v. Basiliko*, 257 F.2d 185, 187 (D.C. Cir. 1958) (noting that courts "may, in proper circumstances, take judicial notice of court records not specifically presented . . . by the parties"); *see also Price v. Coll. Park Honda*, No. 05-

cv-0624, 2006 WL 1102818, at *6–7 (D.D.C. Mar. 31, 2006) (taking judicial notice *sua sponte* of facts that concerned court's subject matter jurisdiction).

Here, the Court must ultimately "find[] it more likely than not that the Iranian government tortured" Amir-Entezam at some point during his detention and after Plaintiffs became a U.S. nationals in December 1993 (Elham) and February 1996 (Ardeshir and Anoush). *Levinson I*, 443 F. Supp. 3d at 173; *see also Mohammadi*, 782 F.3d at 15–16 (noting that, to establish subject matter jurisdiction based on torture under the terrorism exception to the FSIA, the plaintiffs must show that conduct constituting torture occurred after they became U.S. nationals); *Kar*, 2022 WL 4598671, at *16 (similar). Above, the Court found that Amir-Entezam was detained by the Iranian regime in prison for the bulk of the period between 1979 and 2006. *See* Section II.B.4.a, *supra*. The Court also concludes that the evidence presented establishes it is more likely than not that Amir-Entezam was tortured while detained in prison, including during the period after February 1996, by which time all Plaintiffs were U.S. nationals. In making this determination, the Court does not rely on the inadmissible hearsay evidence Plaintiffs offer, such as reports from NGOs or representations from Plaintiffs themselves as to what they were told their father suffered. However, among the dozens of documents Plaintiffs have submitted, a number of them provide admissible evidence that Amir-Entezam was tortured while in prison. As discussed above, admissible reports from the State Department and the United Nations—including reports produced during the relevant time period between 1996 and 2006—find that the Iranian regime tortured prisoners. *See* ECF No. 26-49 at 3 (1999 Interim U.N. Special Representative Report finding that "torture and similar treatment or punishment continue to exist [in Iran] and the prison system is facing unacceptable physical conditions); ECF No. 26-28 at 34–36 (2004 State Department Report finding that many prisons in Iran "were notorious for the cruel and prolonged acts of torture inflicted on

political prisoners").   More, basing his conclusions on reports of human rights organizations, among other evidence, Professor Gabbay concluded that Amir-Entzam was held at Evin Prison—an institution notorious for its "use of cruel and prolonged torture of political opponents," ECF No. 26-28 at 34 (2004 State Department Report)—from the date of his arrest "through 1996" and that "[d]uring his time detained in prison, from 1979 to 2006," it is "highly likely" that Amir-Entezam endured "beatings, interrogations and threats, coupled with attempts to force false confessions, and the denial of adequate medical care," at the hands of the Iranian regime, ECF No. 26-61 at 8, 37; *see also Levinson I*, 443 F. Supp. 3d at 173–74 (finding Prof. Gabbay's testimony, based on "case studies and reports from well-known human rights organizations," that "Iran routinely tortures its prisoners" to be "the most convincing proof" that the plaintiff was likely tortured in Iranian prisons after his abduction in 2007).   Indeed, as the court in *Levinson I* noted, "[t]he courts of this District are—unfortunately—all too familiar with Iran's use of torture."  *Levinson I*, 443 F. Supp. 3d at 174 n.21 (citing *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 175–78 (D.D.C. 2019); *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 150–55, 159–61 (D.D.C. 2017); *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 60–63, 66–69 (D.D.C. 2015)); *see also Kar*, 2022 WL 4598671, at *10, 12 (concluding that Pourzand was tortured "while he was held at [] various Iranian detention facilities" between  2001 and 2006 based, in part, on "admissible evidence that Iran routinely tortures" detainees).  Because "the FSIA does not require this Court to relitigate issues that have already been settled," *Brewer*, 664 F. Supp. 2d at 54, the Court will take judicial notice of the fact that other courts in this District have concluded that Iran regularly tortures its prisoners.  Together, that evidence is sufficient to conclude that it is more likely than not that the Iranian regime tortured Amir-Entezam while he was in prison after February

1996.  *See, e.g.*, *Alinejad*, 2023 WL 4684929, at *16–20 (relying on similar evidence to conclude that an individual imprisoned by Iran was likely tortured).

Plaintiffs also claim that Amir-Entezam was tortured after he was released from prison into house arrest in 2006.  ECF No. 26 at 17–18 (stating that Amir-Entezam continued to be in the custody of the Iranian regime while on home confinement between 2006 and 2018 and that his "severe pain and suffering by Iran lasted throughout his 39-year detention," including his home confinement).  Although it is not necessary to make such a finding to determine whether the Court has subject matter jurisdiction over Plaintiffs' claim—those requirements are satisfied by the finding above that Amir-Entezam likely suffered torture while imprisoned after February 1996—the Court will address Plaintiffs' argument here.  The only evidence supporting Plaintiffs' position is the following statement in Professor Gabbay's expert report:

> While in house arrest, he was serving his sentence in the custody of the Iranian regime.  During this time, he was dealing with severe medical conditions caused by the extreme condition of his detention and the use of forms of physical torture on him.  He could not walk himself but had to use a wheelchair due to permanent damage to his spine, and he suffered kidney failure, hearing loss, and illnesses of his eye, prostate, and pelvis.  At the same time, he was fighting for his claim of innocence.  He was constantly offered a pardon in exchange for confessing to spying for the United States.  While suffering severe physical pain from his treatment while detained in prison and continuing severe psychological pain, all while serving his life sentence, his freedom was within reach if he falsely confessed to the government's fabricated claims.

ECF No. 26-61 at 37.  That is, Professor Gabbay opines that Amir-Entezam was tortured while on home confinement because (1) he continued to suffer the after-effects of his treatment while imprisoned and (2) he endured mental suffering caused by Iran dangling the possibility of a pardon for a false confession.  Neither argument succeeds.

First, Plaintiffs have cited no case that would support the conclusion that the continuing effects of torture themselves constitute torture.  Indeed, under the TVPA, torture is "any *act*,

directed against an individual in the offender's custody or physical control, by which severe pain or suffering . . . , whether physical or mental, is intentionally inflicted." TVPA § 3.  And, in *Kar* (a case in which the plaintiffs were represented by the same attorney who represents Plaintiffs here), the court rejected the argument that the fact that Pourzand endured while on home confinement the continuing psychological effects of torture that he suffered while imprisoned meant that he was tortured after his release from prison.  *See* 2022 WL 4598671, at *11.  Rather, those mental health problems "simply provide[e] further evidence for the conclusion that the pain and suffering [he] experienced while being held in detention centers was torture which led to lasting consequences." *Id.*  This Court agrees that lasting effects of torture are not themselves torture under the governing statute.

Similarly, Plaintiffs have not otherwise shown that Iran tortured Amir-Entezam while he was confined at home.  Although they assert that the regime "constantly" denied him medical care, they point to no admissible evidence that such denials occurred while he was on home confinement.  And, similar to *Kar*, "[t]here is also no indication that [Amir-Entezam] was physically abused during his home confinement."  *Id.*  More, the "psychological pain" stemming from "fighting for his claim of innocence" and being "offered a pardon in exchange for [falsely] confessing to spying for the United States," ECF No. 26-61 at 37, does not meet the definition of

torture.  Returning to the statute, although acts causing mental pain and suffering can constitute torture, that mental pain and suffering must be

> prolonged mental harm caused by or resulting from—
>
> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
>
> (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
>
> (C) the threat of imminent death; or
>
> (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

TVPA § 3.  Plaintiffs have not shown that Iranian officials subjected Amir-Entezam to any such conduct while he was on home confinement.  And, as Judge Bates reasoned in *Kar*, courts have found mental anguish from conduct significantly more severe than that alleged here was not torture:  "In *Simpson I*, the D.C. Circuit concluded that the mental anguish a plaintiff experienced while being 'interrogated and then held incommunicado, threatened with death if she moved from the quarters' where she was being held, and 'forcibly separated from her husband' did not constitute torture."  *Kar*, 2022 WL 4598671, at *11 (quoting *Simpson I*, 326 F.3d at 234).  "If the mental anguish the plaintiff experienced in *Simpson I* while being physically detained and threatened with death did not constitute torture, the Court cannot conclude that the mental anguish [Amir-Entezam]

experienced while on home confinement," although likely designed to "make him feel anxious and uncomfortable," constitutes torture under the FSIA. *Id.*

$$* \quad * \quad * \quad * \quad * \quad *$$

In sum, Plaintiffs have established that this Court has subject matter jurisdiction over their claims by offering sufficient admissible evidence to show that they seek damages for acts of torture committed during a period when Plaintiffs were U.S. nationals by a foreign sovereign—Iran—that has been designated a state sponsor of terror and that they have provided Iran a reasonable opportunity to arbitrate their claims.

### C.    Iran's Liability Under the FSIA

Having addressed personal and subject-matter jurisdiction, the Court now must determine whether Plaintiff has established Iran's liability under a viable cause of action. *See Valore*, 700 F. Supp. 2d at 73. While section 1605A(c) offers a general private right of action, it "does not itself provide the 'substantive basis' for claims brought under the FSIA." *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 361 (D.D.C. 2020). Rather, FSIA plaintiffs are also required "to prove a [specific] theory of liability." *Valore*, 700 F. Supp. 2d at 73; *see also Rimkus*, 750 F. Supp. 2d at 175-76 ("[P]laintiffs in § 1605A actions . . . must articulate the justification for such recovery, generally through the lens of civil tort liability."). To determine if plaintiffs have properly asserted a substantive basis for liability for their claims, the D.C. Circuit "rel[ies] on well-established principles of law, such as those found in Restatement (Second) of Torts." *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009); *see also Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003) (using the Restatement of Torts "as a proxy for state common law" in determining liability under the FSIA). Here, Plaintiffs asserts that Iran is liable

for their emotional trauma as family members of a torture victim under an intentional infliction of emotional distress ("IIED")/solatium theory.  The Court agrees.

"Under the FSIA, a solatium claim is indistinguishable from an IIED claim."  *Valore*, 700 F. Supp. 2d at 85; *see also, e.g.*, *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 84 (D.D.C. 2017).  Iran is liable for IIED if "by extreme and outrageous conduct [it] intentionally or recklessly causes severe emotional distress," both to the primary victim and/or "to a member of such person's immediate family who is present at the time."  *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) ("*Heiser II*") (quoting Restatement (Second) of Torts § 46).  The "immediate family" includes one's "spouse, parents, siblings, and children."  *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 36 n.8 (D.D.C. 2001).  That said, although traditionally IIED requires the family member to be present at the event that resulted in the emotional distress, "the Restatement's caveat 'suggests that . . . "[i]f the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present, no essential reason of logic or policy prevents liability," simply because the person was not present.  *Valore*, 700 F. Supp. 2d at 80 (quoting *Heiser II*, 659 F. Supp. 2d at 27).  So, Plaintiffs may state a claim for IIED even though they were not present while Amir-Entezam was tortured.  *See, e.g.*, *Rezaian*, 422 F. Supp. 3d at 179 (noting that "torture ha[s] been deemed sufficiently outrageous to inflict severe emotional harm on family members who were not present." (citing *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 49–50 (D.D.C. 2001))).

Iran's alleged conduct satisfies the requirements for IIED/solatium.  To start, "acts of terrorism—such as hostage taking, torture, and extrajudicial killing—are 'by their very definition' extreme and outrageous."  *W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 140 (D.D.C. 2019) (quoting *Valore*, 700 F. Supp. 2d at 77); *see also Stethem v. Islamic Republic of Iran*, 201

F. Supp. 2d 78, 89 (D.D.C. 2002) ("All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress.").

Plaintiffs have also offered uncontroverted admissible evidence establishing that they suffered severe emotional distress during the period of Amir-Emtezam's imprisonment, during which it is more likely than not that he was tortured.  The problem with some of this proof is that it relates to conduct and injuries that precede the dates on which Plaintiffs became U.S. nationals, which are also the dates on which the Court acquired subject matter jurisdiction over their claims.  *See, e.g.*, *Mohammadi*, 782 F.3d at 14.  For example, Elham became a U.S. citizen in December 1993, when she was 23 years old.  *See* ECF No. 26-5, ¶¶ 3, 13.  But much of her testimony attests to her suffering as a child and young adult—some of it not attributable to her father's treatment at the hands of the Iranian regime.  For example, she describes the "terrifying, devastating, and extremely traumatizing" experience of being temporarily moved to the United States when she was around five years old, which would have been in approximately 1975, prior to her father's arrest in 1979.  *Id.*, ¶¶ 5–6.  She also describes "freezing from the inside" and being unable to "move, eat, or sleep" when she found out that her father had been arrested and the "dark[] days" she experienced during the years she spent in Sweden between her father's arrest and her family's move to the United States in 1983—but that distress, although likely attributable to Iran, occurred before she was a U.S. national.  *Id.*, ¶¶ 12–13.  Similarly, Ardeshir reported the difficulty of the years in Sweden after Amir-Entezam's arrest and the poverty, abuse, and ridicule he suffered as a child, all of which transpired prior to his naturalization in February 1996 when he was 22.  *See* ECF No. 26-3, ¶¶ 3, 7, 9–10, 12–13.  So, too, with Anoush, who was 19 when he became a U.S. citizen in February 1996.  *See* ECF No. 26-4, ¶¶ 3–4 (asserting that he was born in September 1979 and became a U.S.

citizen in February 1996), 7–9 (describing the suffering and hardships of the years in Sweden and first years in the United States).

The timing is important because the Court can award damages only for emotional distress that post-dates Plaintiffs' naturalization.  Plaintiffs disagree, asserting that the Court can consider emotional distress that pre-dates their status as U.S. nationals because "the statute does not place any explicit or implicit limitation on the period for the calculation of damages" and because the court may apply the continuing tort doctrine to reach emotional distress suffered prior to that date. ECF No. 26 at 40–44.  However, the Court concurs with Judge Bates' analysis in *Kar*, which rejected those arguments.  As the court reasoned there, the argument that injuries suffered before a plaintiff becomes a U.S. national are compensable because Section 1605A "does not place a temporal limitation on the recoverable damages period," ECF No. 26 at 40, fails because it "reverses the order of analysis."  *Kar*, 2022 WL 4598671, at *17.  Rather, a court "must first assure itself it has jurisdiction before it can consider plaintiffs' claims, and if the [c]ourt lacks jurisdiction over any portion of plaintiffs' claims, it lacks power to award damages for that portion, even if the claim is otherwise valid."  *Id.*  As to the continuing tort doctrine, Judge Bates explained that it "allows courts to award damages for certain bad acts that are older than the applicable statute of limitations would otherwise allow."  *Id.* at *16.  However, statutes of limitations are not generally jurisdictional, whereas Section 1605A(a)(2)(ii)'s requirement that "the claimant or victim to be a U.S. national (or fall within other groups not relevant here) 'at the time the [hostage taking, torture, extrajudicial killing, etc.] occurred,'" is clearly a jurisdictional limitation.  *Id.* (alteration in original) (emphasis omitted).  Thus, the statute "prohibits this Court from awarding [P]laintiffs damages for wrongs that occurred before they became citizens even if those wrongs continued after [they] obtained citizenship."  *Id.*  Instead, only the emotional distress suffered by Elham after

December 16, 1993, *see* ECF No. 26-5, ¶ 13 ("On December 16, 1993 [Elham] was finally able to naturalize and become a U.S. citizen.") and by Ardeshir and Anoush after February 23, 1996, *see* ECF No. 26-3, ¶ 16 ("At the age of 22, on February 23, 1996 [Ardeshir] became a naturalized U.S. citizen."); ECF No. 26-4, ¶ 4 ("On February 23, 1996 [Anoush] became a naturalized U.S. citizen."), is compensable.

Notwithstanding these temporal limitations, Plaintiffs have still presented sufficient evidence that they each suffered emotional distress after the date they became U.S. nationals. Elham testified that the day her father was arrested began "a whole new dark chapter in [her] life" and she describes a "hard pit in her stomach" throughout her twenties caused by "knowing that somewhere [her] father was being tortured and there was nothing [she] could do about it." ECF No. 26-5, ¶¶ 12, 15. In the late-1990s, she received a letter from a reporter with the Miami Herald "detailing the torture [her] dad was experiencing," bringing to light "all the torture and abuse [her] father] was living with," which "devastated" her. *Id.*, ¶ 17. She continues to be plagued by fear, paranoia, and panic attacks "as a result of [her] father's treatment" and has sought treatment for severe depression. ECF No. 26-5, ¶¶ 16–17. Her husband and her friend corroborate these assertions. Her husband testified that Elham had a "profound" attachment to her father and that, when she learned of his treatment in the 1990s, she "had a nervous breakdown." ECF No. 26-2, ¶¶ 8–10. According to him, when Elham saw Amir-Entezam in 2015 for the first time in many years, "there was a total collapse." *Id.*, ¶ 16. He reported that she continues to have "frequent nightmares that often wake her screaming from her sleep, difficulty sleeping in general, lack of confidence, and severe fear and paranoia that her family was being monitored and might be harmed by the Iranian government," as well as difficulty trusting and opening up to others. *Id.*, ¶¶ 5–6, 10. Likewise, Elham's friend from college testified that Elham was "a daddy's girl" growing up and

therefore profoundly affected—indeed, "destroyed"—by reports of Amir-Entezam's imprisonment and torture.  ECF No. 26-7, ¶¶ 5–6.  Ardeshir related that the poverty and hardship, punctuated by fear and emotional and physical abuse at the hands of his mother, that he suffered in his youth and young adulthood as a result of his father's detention led him to lead a "lonely and confusing" life, including failing out of college, a career of "endless odd jobs," and, for a ten-month period during his thirties, homelessness.  ECF No. 26-3, ¶¶ 12, 17–18.  In his adulthood, he was burdened by a lack of paternal support and suffered not only from "the pain of knowing [his father] was wrongfully imprisoned and tortured, or fear for [his family's] safety," but also "the deprivation of the opportunity to build a father-son relationship with him throughout [Ardeshir's] life." *Id.*, ¶¶ 18, 20.  His final reunion with his father was emotionally wrenching, less like reconnecting with his father than "meeting a character [he'd] heard or read about." *Id.*, ¶¶ 20–21.  Anoush reported that his "adult life [has] been shaped by both the absence of [his] father and the emotional pain of his mistreatment at the hands of the Iranian government."  ECF No. 26-4, ¶ 20.  The arrest and detention of Amir-Entezam—his family's "lifeline, support system, and role model"—as well as the hardship, abuse, and poverty of the years after his father's arrest—caused Anoush "sadness and depression," frequent nightmares, sleepwalking, and panic attacks through his college years; he continues to experience nightmares and anxiety today.  ECF No. 26-4, ¶¶ 6–7, 9, 16, 22.  Accordingly, the Court is satisfied that Iran is liable for intentional infliction of emotional distress to Plaintiffs as the children of a person tortured by Iran.

### D.    Plaintiffs' Damages

Courts have recognized that quantifying damages for emotional distress caused by the torture of a relative by a state sponsor of terrorism is "undeniably difficult." *Heiser I*, 466 F. Supp. 2d at 269.  Plaintiffs here contend that their emotional distress merits compensatory damages in

the amount of $6.5 million each, plus pre-judgment interest.  ECF No. 26 at 30–36.  Plaintiffs also seek economic damages of $4 million ($1.33 million each)—their estimate of the present-day value of Amir-Entezam's estate had he not been arrested and detained—and punitive damages in the amount of $150 million each.  *Id.* at 36–40.

"To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably certain' (*i.e.*, more likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate' consistent with this [Circuit]'s application of the American rule on damages."  *Roth*, 78 F. Supp. 3d at 402 (alteration in original) (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005)).  In determining the "reasonable estimate," courts may look to expert testimony and prior awards for comparable injuries in similar cases.  *See Reed*, 845 F. Supp. 2d at 213–14.

### 1.    Solatium Damages

"Common law claims of IIED provide for the same relief as the solatium claims pleaded by the Plaintiffs under § 1605A(c)."  *W.A. v. Islamic Republic of Iran*, No. 18-cv-1883, 2020 WL 7869218, at *13 (D.D.C. Mar. 23, 2020) (citing *Valore*, 700 F. Supp. 2d at 85), *report and recommendation adopted*, 2020 WL 7869211 (D.D.C. Apr. 11, 2020).  Here, Plaintiffs have made a successful claim for IIED on the basis of their relation to a person who suffered torture at the hands of the Iranian government.  So, "the specific damages awarded to [Plaintiffs] may be decided using the same framework as solatium claims awarded in previous FSIA cases, and the court may consider precedent pertaining to both IIED and solatium claims."  *Id.*

As noted, Plaintiffs each request $6.5 million for their IIED/solatium claim, comprising a baseline award of $1.5 million derived from the *Heiser* line of cases, plus a $5 million

enhancement, largely to account for the length of time that Amir-Entezam suffered at the hands of the Iranian regime and Plaintiffs' consequent suffering.[22]  *See* ECF No. 26 at 30–36.

Before determining the quantum of damages, however, the Court must first determine that "the consequences of the foreign state's conduct"—here, Plaintiffs' severe emotional distress— were more likely than not to result from that conduct—here, the likely torture of Amir-Entezam. *Roth*, 78 F. Supp. 3d at 402.  The Court easily concludes, as many others have, that torture of an individual while in detention is reasonably certain to cause that individual's family members acute emotional distress. *See, e.g.*, *Doe A-1 v. Democratic People's Republic of Korea*, No. 18-cv-0252, 2021 WL 723257, at *7 (D.D.C. Feb. 24, 2021) ("Each family member plaintiff has established . . . that their emotional distress was reasonably certain to occur as a consequence of the North Koreans' actions," including torture of their family members.); *Panahi v. Islamic Republic of Iran*, No. 19-cv-0006, 2020 WL 6591425, at *9 (D.D.C. Nov. 10, 2020) ("The Court concludes that the torture of [plaintiff] was reasonably certain to cause emotional distress . . . to his former spouse and their children while he was detained in an Iranian prison."); *Warmbier*, 356 F. Supp. 3d at 55 ("[T]he plaintiffs have satisfactorily shown that North Korea's torture, hostage taking and extra-judicial killing of Otto was likely, and reasonably certain, to . . . devastate his family."); *Moradi*, 77 F. Supp. 3d at 72 ("The Court is also satisfied that [plaintiff's sister's] emotional distress 'was reasonably certain to occur' as a result of [plaintiff's] detention and torture." (quoting *Reed*, F. Supp. 2d at 213)).  The Court now addresses the amount of compensatory damages Plaintiffs should receive.

---

[22] Plaintiffs also cite the "sever[ity] [of the] injuries inflicted on their father," ECF No. 26 at 30; however, there is no admissible evidence establishing the seriousness of his injuries.  That is, the Court has not found that Amir-Entezam likely suffered torture based on hearsay reports of the injuries he suffered (many of which pre-date Plaintiffs' U.S. citizenship); it has found he likely suffered torture based on admissible reports of public agencies finding that Iran tortures its detainees, similar findings from courts in this District, and Plaintiffs' expert opinion that Amir-Entezam likely suffered from acts constituting torture while imprisoned.  *See* Section IV.B.4.b, *supra*.

To determine Plaintiff's IIED/solatium damages, the Court will follow the "majority of courts in this district [which] have adopted" the framework set forth in *Heiser* to determine how to quantify the emotional harm caused to family members by terrorist acts.[23]  *Doe A-1*, 2021 WL 723257, at *8.  "Under that framework, 'a spouse, child, or sibling may receive $4 million, $2.5 million and $1.25 million, respectively, for valid claims in which the family member survived the terrorist act.'"  *Id.* (quoting *Reed*, 845 F. Supp. 2d at 214); *see also Kar*, 2022 WL 4598671, at *18 (noting that under the *Heiser* and *Peterson II* frameworks, "the standard damages awards for the immediate family members of a deceased victim are $5 million for parents, $2.5 million for siblings, $8 million for spouses, and $5 million for children.  Those awards are typically halved for family members of an injured victim" (internal citation omitted) (quoting *Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 270 (D.D.C. 2020))).[24]  "Although the *Heiser* framework was developed in the context of large-scale terrorist attacks, courts have also applied the framework in cases of hostage-taking or torture."  *Moradi*, 77 F. Supp. 3d at 72 (applying *Heiser* framework in case where an individual had been unlawfully detained by the Iranian authorities and tortured during nearly six months of detention in an Iranian prison).  Indeed, "[t]he framework has gained strong precedential support as other members of this court have repeatedly continued to follow it in FSIA cases."  *Reed*, 845 F. Supp. 2d at 214; *see also Alinejad*, 2023 WL 4684929, at *22

---

[23] The *Heiser* framework is similar to the *Peterson II* framework, named after *Peterson v. Islamic Republic of Iran* (*Peterson II*), which applied the *Heiser* amounts to family members of victims who died and halved those amounts for family members of surviving victims.  515 F. Supp. 2d 25, 51–52 (D.D.C. 2007), *abrogated on other grounds as recognized in Mohammadi*, 947 F. Supp. 2d at 65.

[24] Although Amir-Entezam is now deceased, Plaintiffs appropriately do not seek the quantum of damages under the *Heiser/Peterson II* line of cases applicable to family members of a deceased victim.  That measure of damages is generally awarded to those whose family members have been victims of extrajudicial killing by a state sponsor of terror.  *See, e.g., Kar*, 2022 WL 4598671, at *19 ("While [Pourzand] died in Iran's custody, the Court has concluded that he was not a victim of an extrajudicial killing.  Thus, under the *Peterson II* and *Heiser* frameworks, [his wife] is entitled to $4 million in solatium damages, and [his children] are each entitled to $2.5 million.").  Here, Plaintiffs have neither claimed nor presented any evidence that Amir-Entezam was the victim of extra-judicial killing by Iran.

(applying the *Heiser/Peterson II* framework to determine the measure of solatium damages) *Kar*,
2022 WL 4598671, at *18 (same); *Cabrera v. Islamic Republic of Iran*, Nos. 19-cv-3835, 18-cv-
2065, 2022 WL 2817730, at *45 (D.D.C. July 19, 2022) ("[R]ecent decisions hew close[ly] to the
*Peterson II* framework."); *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 361 (D.C. Cir. 2018)
("We recognize that many FSIA decisions issued by the District Court follow *Heiser's* solatium
damages model."); *Braun*, 228 F. Supp. 3d at 85 (describing the *Heiser* framework as "a commonly
accepted standardized framework . . . for solatium damages"); *Valore*, 700 F. Supp. 2d at 85–86
(noting "strong precedential support" for the *Heiser* framework).  All that said, nothing requires
this Court to apply *Heiser*'s damages matrix, *see Fraenkel*, 892 F.3d at 361 ("We decline to impose
*Heiser*'s framework as a mandatory scheme under the FSIA."), and even when *Heiser* is used, the
"numbers serve only as an anchor from which the Court should deviate to compensate for specific
circumstances." *Christie v. Islamic Republic of Iran*, No. 19-cv-1289, 2020 WL 3606273, at *26
(D.D.C. July 2, 2020); *see also Fraenkel*, 892 F.3d at 362 ("While past solatium awards from
comparable cases are appropriate sources of guidance for district courts, 'different plaintiffs (even
under FSIA) will prove different facts that may well (and should) result in different damage
awards.'" (quoting *Fraenkel v. Islamic Republic of Iran*, 258 F. Supp. 3d 77, 82 (D.D.C.
2017), *rev'd on other grounds*, 892 F.3d 348 (D.C. Cir. 2018)).  Although there are myriad reasons
why courts may elect to deviate from the *Heiser/Peterson II* framework, situations in which courts
have awarded higher IIED/solatium damages include where "(1) family members had an extraor-
dinarily close relationship to the victim; (2) [where] the family member's emotional trauma was
particularly severe; and (3) [where] the circumstances of the attack made the suffering particu-
larly agonizing for the family." *Abedini*, 422 F. Supp. 3d at 140 (internal citations and quotation
marks omitted).  In the interests of promoting consistency and ensuring that similar harm merits

similar damage awards, this Court will apply the *Heiser/Peterson II* framework and deviate from it if appropriate.  *See Warmbier*, 356 F. Supp. 3d at 58 (adopting the *Heiser* framework "in the interest of consistency"); *see also Kar*, 2022 WL 4598671, at \*18 (noting that judges in this Circuit have applied the *Heiser/Peterson II* framework "[t]o bring some uniformity" to the damages awards in cases under the FSIA's terrorism exception); *Peterson II*, 515 F. Supp. 2d at 54 ("[T]he Court must take pains to ensure that individuals with similar injuries receive similar awards.").  The Court does so with the understanding that the framework is not binding.

The *Heiser/Peterson II* framework indicates that Plaintiffs, as the children of a person who has survived an act of terrorism, are each entitled to damages of $2.5 million on their IIED/solatium claims.  *See, e.g.*, *Taitt v. Islamic Republic of Iran*, __ F. Supp. 3d __, __, 2023 WL 2536518, at \*10–22 (D.D.C. Mar. 16, 2023) (awarding the "base award of $2.5 million in solatium damages" to children of individuals injured in a terrorist attack); *Kar*, 2022 WL 4598671, at \*19 (awarding $2.5 million to the children of a victim of hostage taking and torture who, although deceased, was not a victim of extra-judicial killing by Iran).  So, $2.5 million is the baseline at which the Court will start in assessing whether there are special factors warranting enhancement.[25]

Plaintiffs seek a total solatium damages award of $6.25 million (not including pre-judg-ment interest, discussed below in Section IV.D.2)—that is, they seek an upward departure of more

_____

[25] The Court recognizes that Plaintiffs have cited a baseline damages award of $1.5 million.  *See* ECF No. 26 at 28.  They rely on *Davis v. Islamic Republic of Iran*, which states that "[c]hildren of a deceased victim typically receive an award of $3 million, while children of a surviving victim receive $1.5 million."  882 F. Supp. 2d 7, 14 (D.D.C. 2012).  Oddly, *Davis* also misquotes a footnote in *Oveissi v. Islamic Republic of Iran*, which states that, in "cases where the victim survived the terrorist attack," plaintiffs' "awards are 'valued at half of the awards to family members of the deceased'—$4 million, $2.5 million and $1.25 million to spouses, parents/children, and siblings, respectively," 768 F. Supp. 2d 16, 26 n.10 (D.D.C. 2011) (quoting *Valore,* 700 F.Supp.2d at 85)); *Davis* omits the word "children" from that quotation, *see* 882 F. Supp. 2d at 14 ("As this Court recently explained, in the context of distress resulting from injury to loved ones—rather than death—courts have applied a framework where 'awards are "valued at half of the awards to family members of the deceased"—$4 million, $2.5 million and $1.25 million to spouses, parents, and siblings, respectively.'").  In any case, compliance with the discussion above and the principle that, "[i]n the interest of fairness" courts should "strive to maintain consistency of awards," the Court here will use the *Heiser* matrix.  *Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16, 35 (D.D.C. 2022); *see also Peterson II*, 515 F. Supp. 2d at 54 ("[T]he Court must take pains to ensure that individuals with similar injuries receive similar awards.").  The Court will take

than one-and-one-half times the $2.5 million baseline.  As support, Plaintiffs point to three cases—

*Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107 (D.D.C. 2000); *Panahi*, 2020 WL

6591425; and *Levinson v. Islamic Republic of Iran*, No. 17-cv-00511, 2020 WL 7130164, at *15

(D.D.C. July 16, 2020) ("*Levinson II*"), *report and recommendation adopted*, 2020 WL 5834839

(D.D.C. Oct. 1, 2020) ("*Levinson III*").  Two of those cases did not apply the *Heiser/Peterson II*

matrix.  *Anderson*, which awarded $6.7 million to the child of an individual taken hostage and

tortured, *see* 90 F. Supp 2d at 113—pre-dates the *Heiser/Peterson II* regime and its standardizing

influence, and therefore is of limited assistance, *see, e.g.*, *Kar*, 2022 WL 4598671, at *19 (refusing

to follow *Anderson* because it pre-dates the *Heiser* framework); *see also Alinejad*, 2023 WL

4684929, at *23 (same).  In *Panahi*, the court awarded $5 million to the minor children of a victim

who was detained and tortured in an Iranian prison.  2020 WL 6591425, at *10.  Although that

case post-dates *Heiser* and *Peterson II*, the court did not purport to apply their frameworks; indeed,

it cited the award in *Anderson* as a comparator.  *Id.* at *10; *see Kar*, 2022 WL 4598671, at *19

(distinguishing a case in which the court awarded damages greater than the *Heiser* framework

because it "determined the appropriate amount of damages in part by referring to . . . *Anderson*");

*see also Alinejad*, 2023 WL 4684929, at *23 (similar, distinguishing *Panahi*).  The Court therefore

finds those two cases of limited use here.

     *Levinson II* is a somewhat closer call.  The court in that case recommended damage awards

for the torture victim's wife and children that far exceeded the *Heiser* framework—$14 million for

the victim's wife and $6.5 to the victim's children.  2020 WL 7130164, at *16.  The victim in

*Levinson II* had, at the time damages were being considered, been missing for 13 years—"the

longest-held American hostage in history," over which time the family had "been subjected to . . .

_____

into account, however, the fact that it increased the baseline award from that requested by Plaintiffs when considering
any enhancement to the amount of damages.

shifting and misleading explanations by U.S. and Iranian officials" and threats from individuals alleging they were holding him, at least some of which were apparently designed for misdirection. *Id.* at *1, *4, *15.  Further, the family members in that action "had to watch a video and photographs of [their father], chained and in prison garb, begging for help" and had "upended their lives for more than a decade to gain [his] release," meeting with Iranian officials in the United States and Iran and "pleading [their] case to the FBI, the Secretary of State, and the President of the United States."  *Id.* at *3, *15.  There is some similarity between that case and this one.  Here, Plaintiffs have presented evidence sufficient to establish that Amir-Entezam was held in prison and likely tortured from 1979 until 2006—a period that covers approximately thirteen years after Elham became a U.S. national and ten years after Ardeshir and Anoush did; indeed, he has been called "Iran's longest-serving political prisoner."  ECF No. 26-26 at 15.  More, although there are no allegations that Plaintiffs here were forced to watch video of their father chained and begging for help, there is evidence that third-party reports of Amir-Entezam's torture—at least one unprompted and unwelcome—caused them significant distress.  *See, e.g.*, ECF No. 26-5, ¶ 17; *see also* ECF No. 26-3, ¶ 15; ECF No. 26-4, ¶ 21.  These facts convince the Court that some enhancement of the *Heiser/Peterson II* baseline damages award is appropriate here—but not an enhancement of the magnitude applied in *Levinson II*.

First, the *Levinson II* enhancement is far greater than the "relatively small" departures that have generally been approved in this Circuit for family members of victims of torture.  *Kar*, 2022 WL 4598671, at *19 (quoting *Valore*, 700 F. Supp. 2d at 86); *see, e.g.*, *Alinejad*, 2023 WL 4684929, at *24 (applying an upward departure of 33 percent to a sibling who had "shown an especially close relationship with her brother," suffered from guilt that she was responsible for his detention, and had herself been targeted by the Iranian regime, including through a plot to kidnap

her); *Valore*, 700 F. Supp. 2d at 86 (applying an upward departure of 25 percent to a sister's damages where her "emotional suffering stands out as particularly devastating" and included "several nervous breakdowns, at least one of which required hospitalization, from which she . . . never fully recovered). Second, the Court has already increased the Plaintiff's requested baseline award by $1 million in an effort to "ensure that individuals with similar injuries receive similar awards." *Peterson II*, 515 F. Supp. 2d at 54. More than doubling that baseline threatens to violate that tenet. That tenet, too, is relevant to the third reason the Court will not diverge from the baseline as significantly as the *Levinson II* Court did. As repellent as it is to weigh the relative suffering of plaintiffs who have endured the detention and torture of a family member by a state sponsor of terror, that is precisely what these cases require courts to do. The *Levinson II* plaintiffs provided evidence that their distress was exacerbated by "shifting and misleading explanations by U.S. and Iranian officials" of Levinson's circumstances and threats and ransom demands from operatives apparently working on behalf of the Iranian regime, as well as evidence of the plaintiffs' "tireless campaign to secure his release." 2020 WL 7130164, at *1, *3–4, *15. Those exacerbating features are not present here. Accordingly, the Court will not substantially deviate from the *Heiser/Peterson II* baseline as the court in *Levinson III* did, but will apply an enhancement of 30 percent, or $750,000, to each Plaintiffs' damages award for a total of $3.25 million apiece.

### 2. Prejudgment Interest

Plaintiff also seeks prejudgment interest on the compensatory damages award. ECF No. 26 at 33. The decision to award such interest "is subject to the discretion of the court and equitable considerations." *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997) (internal quotation marks omitted) (quoting *Motion Picture Ass'n of Am. v. Oman*, 969 F.2d 1154, 1157 (D.C. Cir. 1992)); *see also Forman v. Korean Air Lines, Co.*, 84 F.3d 446, 450 (D.C. Cir. 1996). "When

an award without prejudgment interest fully compensates a plaintiff, an award of prejudgment interest no longer has the intended compensatory purpose and should be denied." *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012) (quoting *Price*, 384 F. Supp. 2d at 135).

Courts in this Circuit are split on the award of prejudgment interest in FSIA cases. Some have made such an award where there was a significant delay between the attack and relief given. *See, e.g.*, *Reed*, 845 F. Supp. 2d at 214 (citing *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 263-65 (D.D.C. 2008)). Other courts have rejected that justification, reasoning that the *Heiser* framework reflects the appropriate level of total, just compensation. *See, e.g.*, *Wyatt*, 908 F. Supp. 2d at 232 ("[P]ain and suffering and solatium damages are both designed to be fully compensatory."). In line with that latter view, "the majority of Judges on this Court to consider the issue of prejudgment interest for FSIA damages awards have held 'the "values set by" the *Heiser* framework "represent the appropriate level of compensation, regardless of the timing of the attack,"'" and therefore deny requests for prejudgment interest on solatium damages. *Blank*, 2021 WL 3021450, at *14 (quoting *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 60 (D.D.C. 2020) (collecting cases)); *see also Selig*, 573 F. Supp. 3d at 77 ("[T]he overarching tide of persuasive precedent . . . plainly weighs against awarding prejudgment interest." (alterations in original) (quoting *Akins v. Islamic Republic of Iran*, 549 F. Supp. 3d 104, 121 (D.D.C. 2021))). As shown by a report and recommendation adopted by then-District Judge Ketanji Brown Jackson in *Doe*, the undersigned adheres to the latter view that prejudgment interest should not be awarded on solatium damages awarded under the *Heiser* framework. *See Doe v. Syrian Arab Republic*, No.

18-cv-0066, 2020 WL 5422844, at *18 (D.D.C. Sept. 10, 2020). The Court therefore denies Plaintiff's request for prejudgment interest.

### 3. Economic Damages

Under Section 1605A, foreign state-sponsors of terrorism are liable to victims for economic losses stemming from injuries or death sustained because of the foreign state's conduct. 28 U.S.C. § 1605A(c). To obtain an award of damages, plaintiffs must "prove the amount of damages by a reasonable estimate." *Reed*, 845 F. Supp. 2d at 213. Neither a plaintiff's unsupported testimony nor representations of counsel is sufficient to reasonably prove such damages. *See, e.g.*, *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 71 & n.10 (D.D.C. 2015). Rather, in determining the amount of economic damages, a court may rely on documentary evidence or expert testimony, such as the report of a forensic economist. *See, e.g.*, *Barry*, 437 F. Supp. 3d at 59; *Warmbier*, 356 F. Supp. 3d at 55. Because "[u]nlike damages for pain and suffering, [economic damages] . . . are not hard to quantify, [] the Court will not excuse plaintiffs' failure to support the claim . . . with competent evidence." *Moradi*, 77 F. Supp. 3d at 71.

Plaintiffs seek to recover $4 million in economic damages which represents their estimate of the value of Amir-Entezam's estate had he (1) not "lost all of his assets that he ha[d] accumulated" upon his arrest and (2) been able to "contribute[] to his assets and earn income from the time of his arrest in 1979 until his death in 2018." ECF No. 26 at 36–37. However, Plaintiffs admit that they have not "produce[d] admissible evidence [concerning] the value of [the] estate" and have not "provide[d] an expert report in that regard." *Id.* at 37. Rather, they rely only on the unsupported testimony of Ardeshir and representations of counsel. *See id.*; ECF No. 26-3, ¶ 8. That is insufficient. *See, e.g.*, *Kar*, 2022 WL 4598671, at *20 (denying a request for economic damages where the plaintiffs failed to submit an expert report or financial documents to support

their claim, but "relied almost exclusively on their own declarations to estimate" the amount of economic damages they claimed); *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 40–41 (D.D.C. 2016) (refusing to award economic damages when no supporting documents were submitted); *cf. Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d at 31 (D.D.C. 2011) (crediting estimates of property value that were supported by a declaration of the manager of the estates and evidence that the plaintiff "owned several homes, significant land, two farms[,] and significant water rights prior to his exile"). Therefore, the Court will not award economic damages here. *See Moradi*, 77 F. Supp. 3d at 71 (refusing to award economic damages where the plaintiff did not adequately support the request).

### 3.    Punitive Damages

Plaintiffs seek $150 million each in punitive damages from Iran. ECF No. 26 at 40. "Punitive damages are not meant to compensate the victim, but instead meant to award the victim an amount of money that will punish outrageous behavior and deter such outrageous conduct in the future." *Oveissi*, 879 F. Supp. 2d at 56. "Four factors are relevant in deciding the level of punitive damages appropriate in a given case: '(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants.'" *Selig*, 573 F. Supp. 3d at 75 (quoting *Estate of Steinberg v. Islamic Republic of Iran*, No. 17-cv-1910, 2019 WL 6117722, at *9 (D.D.C. Nov. 18, 2019)).

Here, each of those factors counsel in favor of awarding punitive damages. Torture itself is appalling and here it caused significant emotional suffering to each of the plaintiffs. Further, "[t]here is a need for deterrence because, time and again, courts in this district have been confronted with families shattered by" Iran's wanton cruelty to its prisoners. *Selig*, 573 F. Supp. 3d

at 75.  Finally, the defendant, "as [a] state actor[], can be presumed to possess significant wealth." *Christie*, 2020 WL 3606273, at *21; *see also Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 25 (D.D.C. 2016) ("Iran is a sovereign and has substantial wealth.").  Indeed, Plaintiffs have provided evidence that Iran's expenditures on supporting terrorist causes alone runs to many hundreds of millions of dollars annually.  *See* ECF No. 26-44 at 4; ECF No. 26-45 at 203.

There are several different potential methods to calculate punitive damages in FSIA cases. "The first is to 'multiply the foreign state's annual expenditures on terrorism by a factor between three and five.'"  *Selig*, 573 F. Supp. 3d at 75 (quoting *Braun*, 228 F. Supp. 3d at 87).  "A second approach is to award each family of a decedent $150 million in punitive damages."  *Id.* at 76.  A variant of the second awards each plaintiff $150 million.  *See, e.g.*, *Levinson III*, 2020 WL 5834839, at *2.  "Third, some courts in this district have calculated the total compensatory damages awarded for a victim and then multiplied that award 'by a factor between one and five.'"  *Selig*, 573 F. Supp. 3d at 76 (quoting *Fritz*, 324 F. Supp. 3d at 65).  Fourth, some courts have awarded punitive damages equal to the amount of compensatory damages.  *See, e.g.*, *Alinejad*, 2023 WL 4684929, at *27 (awarding punitive damages equal to compensatory damages); *Kar*, 2022 WL 4598671, at *22 (same); *Blank*, 2021 WL 3021450, at *13 (same); *Panahi*, 2020 WL 6591425, at *12 (same); *Christie*, 2020 WL 3606273, *28 (same); *Azadeh v. Islamic Republic of Iran*, No. 16-cv-1467, 2018 WL 4232913, at *23 (D.D.C. Sept. 5, 2018) (same); *Hekmati*, 278 F. Supp. 3d at 167 (same).

Plaintiffs concede that the first approach, which is generally used in cases involving "exceptionally deadly attacks," is inappropriate here.  ECF No. 26 at 39 (quoting *Levinson III*, 2020 WL 5834839, at *2).  Likewise, the Court will not apply the third method—using a multiplier of compensatory damages to calculate punitive damages—because only "[a] minority of judges in

this jurisdiction follow this approach" and, more, Plaintiffs do "not ask the Court to award puni-tive damages this way." *Selig*, 573 F. Supp. 3d at 76; *see also Abedini*, 422 F. Supp. 3d at 142 ("[T]he method of applying a court-determined multiplier of compensatory damages was only uti-lized in a special circumstance during actions against Iran by hundreds of plaintiffs who were family members or victims themselves of the Beirut bombing.").

The second method awards a flat $150 million in punitive damages—either per family or per plaintiff. That is the approach Plaintiffs urge here. *See* ECF No. 26 at 40 ("[A] a punitive damages award of $150,000,000 for each Plaintiff would be appropriate."). "As this Court and others have explained, however, the $150 million figure is most appropriate in cases where the victim of terrorism has died in the attack." *Alinejad*, 2023 WL 4684929, at *26; *see also W.A.*, 2020 WL 7869218, at *20 ("The weight of the case law indicates that in cases where at least one of the plaintiffs dies the [$150 million] lump sum approach is used."); *see also Saberi*, 541 F. Supp. 3d at 87 (rejecting the $150 million lump sum approach in case involving surviving victim of torture because "that method 'is more typically employed when similar conduct has never been litigated or in cases of terrorist attacks more deadly than what happened here'" (quoting *Frost*, 419 F. Supp. 3d at 117)); *Doe A-1*, 2021 WL 723257, at *10 (similar); *Doe*, 2020 WL 5422844, at *17 (rejecting the $150 million lump sum approach because it "is typically used in cases where, unlike here, at least one of the plaintiffs dies"). Additionally, the $150 million flat-award approach has recently been criticized "for its inflexibility." *Selig*, 573 F. Supp. 3d at 76 (citing *Christie*, 2020 WL 3606273 at *22 ("[The flat-award method] trades discretion for predictability[.]"), and *Abedini*, 422 F. Supp. 3d at 142 ("[The flat-award method] limits a judge's discretion to tailor a punitive award appropriate to the magnitude of the underlying injury[.]"). More importantly, it is just not clear that massive punitive damage awards like the one requested by Plaintiff are having

any real deterrent effect on the Iranian regime.  *See Christie*, 2020 WL 3606273, at *29 (noting "'the lack of any evidence that high awards have successfully deterred' Iran" (quoting *Bluth*, 203 F. Supp. 3d at 26)).  By now, Iran's total liability stemming from FSIA judgments totals well over $10 billion, and "[a]dding hundreds of millions of dollars to that amount in this case is not likely to have a meaningful deterrent effect."[26]  *Id.* (noting that, in 2009, one court calculated that "Iran had '10 billion . . . outstanding court judgments' in FSIA cases" and that this "amount has surely ballooned over the last decade" (quoting *Iran Terrorism Litig.*, 659 F. Supp. 2d at 37)).  For all these reasons, the Court declines to award each Plaintiff $150 million in punitive damages.

The final method for calculating punitive damages would simply have punitive damages mirror compensatory damages.  Numerous courts with facts similar to those here have followed this method.  *See, e.g.*, *Kar*, 2022 WL 4598671, at *22 (awarding victim's widow and children equal amounts in compensatory and punitive damages ($4 million plus prejudgment interest and $2.5 million plus prejudgment interest, respectively) where the victim survived torture in Iran but died prior to the filing of the action); *Abedini*, 422 F. Supp. 3d at 142 (awarding the victim's sister equal amounts of compensatory and punitive damages ($1.27 million) in case where the victim survived torture in Iranian prisons); *Moradi*, 77 F. Supp. 3d at 73 (awarding the victim's wife equal amounts of compensatory and punitive damages ($4 million) in case where the victim survived torture in Iranian prisons).  In *Kar*, for example, the victim was held by Iran either in prison or on house arrest for the bulk of the period between November 2001 until his death—not at the hands of the Iranian regime (although in its custody)—in 2011; he was tortured while detained in Iranian prisons.  2022 WL 4598671, at *7–10.  The court awarded the victim's two daughters $2.5 million in solatium damages under the *Heiser/Peterson II* regime.  *See id.* at *19.  It thereafter awarded

---

[26] Indeed, in *Levinson II* alone, the Court awarded plaintiffs over $1.3 billion in punitive damages against Iran.  *Levinson II*, 2020 WL 5834839, at *3.

punitive damages in the amount of compensatory damages (which, in that case, were enhanced through an award of prejudgment interest). *See id.* at \*22. The Court will follow the guidance of *Kar* and similar cases and calculate Plaintiffs' punitive damages by reference to their compensatory damages. *See, e.g.*, *Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84, 97 (D.D.C. 2014) (awarding "punitive damages in an amount equal to the total compensatory damages" where "[d]oing so will result in a punitive damage award consistent with the punitive damage awards in analogous cases"). Not only does this approach have "the merit of following Supreme Court precedent on punitive damages,"[27] *Selig*, 573 F. Supp. 3d at 77, the "method of doubling the compensatory damages also provides 'a bad man' with a modicum of predictability," *Abedini*, 422 F. Supp. 3d at 142. And, importantly, equalizing compensatory and punitive damages still acts as a "forceful deterrent against Iran's further support" and commission of terrorist acts. *Sheikh*, 485 F. Supp. 3d at 273. Thus, the Court will grant each Plaintiff $3.25 million in punitive damages; together with compensatory damages, each Plaintiff will be awarded a total of $6.5 million.

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for default judgment against the Islamic Republic of Iran is **GRANTED** and each Plaintiff shall be awarded a total of $6.5 million in overall damages. A separate Order embodying this damages award will be entered pursuant to Rule 58(a)

---

[27] In *State Farm Mutual Automobile Insurance Co. v. Campbell*, the Supreme Court held that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." 538 U.S. 408, 425 (2003). Although Iran, as a foreign sovereign, has no rights under the Fifth Amendment's Due Process Clause, courts adjudicating FSIA matters have looked to the constitutional limits on punitive damages inasmuch as those guardrails "embody general concerns for fairness and consistency." *Flanagan*, 87 F. Supp. 3d at 126 n.37. Like those courts, this Court, too, finds those limits instructive.

of the Federal Rules of Civil Procedure contemporaneously with this Memorandum Opinion and

Order.


Date:  September 5, 2023

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE